**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MM STEEL, LP, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 4:12-CV-01227 |
| vs. | § | |
| | § | |
| RELIANCE STEEL & ALUMINUM CO., | § | JURY DEMANDED |
| CHAPEL STEEL CORP., AMERICAN | § | |
| ALLOY STEEL, INC., ARTHUR J. MOORE, | § | |
| JSW STEEL (USA) INC., NUCOR CORP. & | § | |
| SSAB ENTERPRISES, LLC D/B/A SSAB | § | |
| AMERICAS, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT SSAB'S ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT

Defendant SSAB Enterprises, LLC, d/b/a/ SSAB Americas ("SSAB") hereby answers the

Plaintiff's Original Complaint ("the Complaint").  This Answer is based upon SSAB's

investigation to date, and SSAB reserves the right to amend this Answer during the course of the

litigation.  Any allegation not explicitly admitted herein is denied.  To the extent SSAB admits or

denies a statement below that is not directed to it, then that admission or denial is based on

SSAB's information and belief.  Moreover, the headings contained within the Complaint are not

substantive allegations to which an answer is required.  To the extent those headings are

substantive allegations to which an answer is required, SSAB denies the allegations.  SSAB

states as follows:

1.      This case involves a group boycott in violation of Section 1 of the Sherman Act

to drive Plaintiff MM Steel out of the steel distribution business.

**ANSWER:**     Paragraph 1 purports to characterize the Complaint and thus no response from SSAB is required.  To the extent that a response is required, SSAB admits that Plaintiff purports to bring claims under Section 1 of the Sherman Act.  SSAB denies that any of the purported claims have any basis in fact or law, and denies that Plaintiff is entitled to recover under any of the claims alleged.  SSAB denies any and all remaining allegations of Paragraph 1.

2.     Steel distributors are referred to as metals service centers within the industry.  Such centers distribute metals for industrial customers and they perform some first-stage processing of various steel products.  Plaintiff MM Steel is a metals service center.

**ANSWER:**     SSAB admits that steel service centers are sometimes referred to as metals service centers within the industry, that some service centers distribute steel, and that some service centers perform some first-stage processing of various steel products.  SSAB denies the remaining allegations of Paragraph 2.

3.     Defendant Reliance (together with its wholly owned division Chapel) is the largest metals service center in the country.  Defendant American Alloy is one of the largest such metals service centers in the United States. Defendant Arthur J. Moore is the President and owner of American Alloy.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 3, and therefore denies them.

4.     Defendants JSW, Nucor, and SSAB are steel producers.  JSW, which is owned by the Jindal Group, a global conglomerate, operates a steel mill in Baytown, Texas.  Nucor and SSAB have steel mills in Alabama, Iowa, and North Carolina, among other states and foreign countries.  All three produce steel products that they sell to metals service centers, among others.

**ANSWER:**     SSAB admits that it is a steel producer, and that it has steel mills in Alabama and Iowa and in foreign countries.  SSAB admits that it produces steel products that it sells to some metals service centers.  To the extent that the allegations of Paragraph 4 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies the remaining allegations of Paragraph 4.

5.      In this case, Reliance/Chapel and American Alloy, the metals service centers Defendants, entered into one or more agreements to drive Plaintiff MM Steel out of business because they feared it would take business away from them.  JSW, Nucor, and SSAB, the steel mills Defendants, conspired with Reliance/Chapel and American Alloy to execute a group boycott by refusing to sell steel to Plaintiff MM Steel or to anyone with whom Plaintiff MM Steel attempted to partner.

**ANSWER:**     To the extent that the allegations of Paragraph 5 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies the remaining allegations of Paragraph 5.

6.      Plaintiff MM Steel is owned by Mike Hume and Matt Schultz, who collectively have decades of experience in the steel industry.  They have been very successful during that time working for, among others, American Alloy (until 1999) and for Reliance/Chapel from 1999 until they left Chapel to start doing business as MM Steel in September 2011.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 6, and therefore denies them.

7.      In a few years after opening Chapel's Houston office, Hume and Schultz made it into one of Chapel's most profitable centers nationally.   That success continued even after Reliance purchased Chapel in 2004.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 7, and therefore denies them.

8.      The agreement between competitors Reliance/Chapel and American Alloy is referred to as a horizontal agreement under the Sherman Act and it is condemned as *per se* illegal.   That means there is no business or economic justification that would allow such an agreement to withstand judicial scrutiny.   Once the fact of the agreement or conspiracy has been established, all that remains is to determine the amount of damages suffered by Plaintiff MM Steel.

**ANSWER:**     The allegations of Paragraph 8 purport to state a legal conclusion to which an answer is not required.   To the extent an answer is required, SSAB denies the allegations of Paragraph 8.   To the extent that the allegations of Paragraph 8 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.

9.      In this case, after Hume and Schultz left Chapel to start Plaintiff MM Steel, Reliance/Chapel and American Alloy conspired with the steel mills Defendants to prohibit Plaintiff MM Steel from securing steel products.   Without the ability to buy steel, Plaintiff MM Steel could not compete with Reliance/Chapel, American Alloy, or any other metals service center.

**ANSWER:**     To the extent that the allegations of Paragraph 9 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about

the truth of those allegations, and therefore denies them.  SSAB denies the remaining allegations of Paragraph 9.

10.     In addition to other evidence described below, emails from Defendant Moore to his employees show that Reliance/Chapel and American Alloy were concerned about competing with Plaintiff MM Steel, prompting the concerted action that culminated in the group boycott.

**ANSWER:**    To the extent that the allegations of Paragraph 10 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies the remaining allegations of Paragraph 10.

11.     For example, here is Defendant Moore emailing his employees about Hume and Schultz after he learned that they had formed Plaintiff MM Steel:  "I don't give up easily on ones that I know are not worthy of being in this business, so I will continue to go to all extremes with ones I know to make the trip a rough one [for Plaintiff MM Steel]….  We will sell at cost, if necessary, to take business away from these bums.  *I plan to have a conversation with the President of Reliance*."  (Emphasis added.)

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 11, and therefore denies them.

12.     In another email, Defendant Moore states that he and his employee Jo Ann Kotzur "were invited to meet with Stan Altman, President of Chapel."  Defendant Moore then provides the purpose of that meeting:  "Chapel, along with Reliance, plan on taking all available courses of action, legally *and otherwise*, including notifying any mill that is selling them [Plaintiff MM Steel], that they can no longer expect any future business from

5

Chapel/Reliance."  (Emphasis added.)

     **ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 12, and therefore denies them.

     13.     Sometime after the meeting with Reliance/Chapel, American Alloy followed suit and exacted the same promise from any mill that was selling or considering selling steel to Plaintiff MM Steel.

     **ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 13, and therefore denies them.

     14.     Instead of engaging in robust competition, Defendants Reliance/Chapel and American Alloy have engaged in a group boycott that is ongoing, as explained further below.

     **ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 14, and therefore denies them.

     15.     The reference in Defendant Moore's email to "legally" refers to a state court lawsuit filed by Chapel against Hume, Schultz, MM Steel, and two other former employees of Chapel shortly after they started doing business as MM Steel on September 1, 2011.

     **ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 15, and therefore denies them.

     16.     In that lawsuit, Chapel asserted violations of alleged covenants not to compete and secured a temporary restraining order on September 15, 2011.  Before a temporary injunction was concluded, the parties reached a settlement that included an agreed permanent injunction prohibiting MM Steel and the other defendants from soliciting certain Chapel customers until March 15, 2012.  Other than that restriction, however, MM Steel, Hume, and

Schultz believed they could go on with their business of buying and selling steel.   But as Defendant Moore's emails and the other evidence set forth below show, Defendants Reliance/Chapel and American Alloy had other ideas.   Indeed, it is now clear to Plaintiff MM Steel, Hume, and Schultz that the settlement and the agreed permanent injunction in the state court case were a sham and fraudulently induced, because Defendants did not intend to allow Plaintiff MM Steel to compete as a metals service center.

**ANSWER:**   To the extent that the allegations of Paragraph 16 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.   SSAB denies the remaining allegations of Paragraph 16.

17.   At its core, this is a *per se* case under Section 1 of the Sherman Act, devised and executed by Defendants Reliance/Chapel, American Alloy, and their co-conspirator steel mills, among others.   This case is *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) and *Fashion Originator's Guild of America, Inc. v. FTC*, 312 U.S. 457 (1941).   No offered explanation can alter the fact that the restraint in this case is naked and anti-competitive, and thus not ancillary under the Sherman Act.   Its only purpose was to cripple a competitor permanently—to seriously impair the competitive opportunities of a rival in a significant and permanent way.   To Defendants, nothing short of a group boycott would do.   All of the conduct set forth herein was committed knowingly and intentionally.

**ANSWER:**   The allegations in the first three sentences of Paragraph 17 purport to state a legal conclusion to which an answer is not required.   To the extent an answer is required, SSAB denies the allegations of Paragraph 17.   To the extent that the allegations of Paragraph 8 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to

form a belief about the truth of those allegations, and therefore denies them. SSAB denies the remaining allegations of Paragraph 17.

18. Although Defendants are also liable under state law, namely for tortious interference with existing and prospective contracts, breach of contract, civil conspiracy, and business disparagement, the gravamen of this Complaint is a group boycott emanating from horizontal agreements among direct competitors Reliance/Chapel and American Alloy, and related agreements with and among co-conspirators, the steel mills JSW, Nucor, SSAB, and perhaps others.

**ANSWER:** The allegations of Paragraph 18 purport to state a legal conclusion to which an answer is not required. To the extent an answer is required, SSAB denies the allegations of Paragraph 18. To the extent that the allegations of Paragraph 18 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them. SSAB denies the remaining allegations of Paragraph 18.

19. The evidence in this case goes far beyond the suggestion of "mere parallel conduct that could just as well be independent action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566 (2007). Beyond the *detailed allegations* of multiple meetings, agreements, and concerted acts in violation of Section 1, there already exists evidence of an *actual horizontal agreement* and concerted action in violation of Section 1.

**ANSWER:** The allegations of Paragraph 19 purport to state a legal conclusion to which an answer is not required. To the extent an answer is required, SSAB denies the allegations of Paragraph 19.

20. Before entering into a horizontal agreement in violation of Section 1 of the

Sherman Act, American Alloy's Moore had instructed his employees to not do any business

with Reliance/Chapel, solely because of Chapel's poaching of Hume and Schultz in 1999.

Defendant Moore's command to his employees to not do any business with Reliance/Chapel

lasted 12 plus years, until the desire to jointly crush a threat—Plaintiff MM Steel, the new

competitor—to their businesses brought together American Alloy and Reliance/Chapel.

     **ANSWER:**    To the extent that the allegations of Paragraph 20 relate to persons or

entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about

the truth of those allegations, and therefore denies them.  SSAB denies the remaining allegations

of Paragraph 20.

     21.    In an email to Defendant Moore, an American Alloy employee cautiously

approached Moore about doing business with Reliance/Chapel in light of the news that Plaintiff

MM Steel would be competing with American Alloy and Reliance/Chapel.  That employee,

Greg van Wagner, asked Defendant Moore the following in an email:  "What are your feelings

about dealing with Chapel/Reliance with Matt [Schultz] and Mike [Hume] out of the picture?"

Defendant Moore's reply confirmed the prohibition on doing business with Reliance/Chapel,

but gave a hint of what was to come:  "Greg, until I am sure they have no more foot

prints in that organization, [sic] no sales or quotes to them. Once we get the entire story

on  their departure, I will decide the future with dealing with Chapel."

     **ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the

truth of the allegations of Paragraph 21, and therefore denies them.

     22.    The "future" Defendant Moore was referring to was the group boycott.

American Alloy's van Wagner confirmed it in another email:  "We will do all we can to help

Reliance in going after them [Plaintiff MM Steel]…. I would like to throw Jindal [JSW]

under the bus *on this deal with Reliance* but I think it would be lost on Rajesh [Khosla, a JSW salesman]." [Emphasis added.]  To insure nothing would be lost on Khosla or JSW, Defendants recruited JSW's President, Mike Fitch, who had already sold steel to Plaintiff MM Steel pursuant to a written contract, but as explained further below, refused once Defendants' group boycott was executed.

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 22, and therefore denies them.

23.    Defendant Moore later confirmed the deal with Reliance/Chapel in an email:  "Now that these bums are no longer with Chapel, I informed Stan that [American Alloy] would welcome their inquiries and orders, and Stan assured me that he would notify his people that they would appreciate our business as well…. I don't expect us to give them any breaks on pricing, but I am sure we will soon see their inquiries, so it is OK to sell them."

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 23, and therefore denies them.

24.    Other evidence shows that Defendants had communications and meetings over a period of time in furtherance of the group boycott.

**ANSWER:**   To the extent that the allegations of Paragraph 24 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies the remaining allegations of Paragraph 24.

25.    Plaintiff MM Steel has suffered antitrust harm because its loss of profits and other losses are directly related to the conduct of the Defendants and their conspiracy.

**ANSWER:**    The allegations of Paragraph 25 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 25.

26.    This action is brought under Section 4 of the Clayton Act, 15 U.S.C. §15, to recover treble damages, costs, and attorney's fees for the injuries sustained by Plaintiff MM Steel because of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**    The allegations of Paragraph 26 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB admits that Plaintiff purports to bring this action under Section 4 of the Clayton Act (15 U.S.C. §15), but denies that the Complaint states a claim or that this action may be maintained under that statute.  SSAB admits that Plaintiff claims to seek certain remedies as set forth in Paragraph 26, but denies that Plaintiff is entitled to them.  SSAB denies the remaining allegations of Paragraph 26.

27.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337 and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

**ANSWER:**    The allegations of Paragraph 27 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB admits that Plaintiff purports to bring this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 4 of the Clayton Act (15 U.S.C. §15), but denies that the Complaint states a claim or that this action may be maintained under those statutes.

28.    This Court may  further exercise supplemental jurisdiction over  Plaintiff MM Steel's state law claims pursuant to 28 U.S.C. § 1367 because the claims form part of the same case or controversy asserted under the Sherman and Clayton Acts.

**ANSWER:**    The allegations of Paragraph 28 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB admits that Plaintiff purports to bring this action pursuant to 28 U.S.C. § 1367, but denies that the Complaint states a claim or that this action may be maintained under that statute.

29.    Venue is appropriate in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d) because during the relevant period Defendants resided or transacted business in this District, a substantial portion of the affected commerce described herein was carried out in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**ANSWER:**    The allegations of Paragraph 29 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB admits that it has transacted business in this District, and that it can be found and/or has agents in this District.  To the extent the allegations of Paragraph 29 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  SSAB denies the remaining allegations of Paragraph 29.

30.    Plaintiff MM Steel, LP is a Texas limited partnership engaged in the purchase and sale of steel products, as described more fully below. Plaintiff MM Steel was injured and continues to be injured in its business by reason of Defendants' illegal conduct forbidden by the antitrust and other laws.

**ANSWER:**    The second sentence of Paragraph 30 purports to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations.  To the extent that the allegations of Paragraph 30 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of

those allegations, and therefore denies them.

31.     Defendant Reliance Steel & Aluminum Co. is a foreign corporation engaging in interstate commerce through the purchase and sale of steel products and conducting business in this State, through numerous wholly-owned divisions.  Summons may be served upon its registered agent, C T Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234, or wherever else it may be found.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 31, and therefore denies them.

32.     Defendant Chapel Steel Corp. is a foreign corporation engaging in interstate commerce through the purchase and sale of steel products and conducting business in this State. Summons may be served upon its registered agent, C T Corporation, 650 N. St. Paul St., Dallas, Texas 75201, or wherever else it may be found.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 32, and therefore denies them.

33.     Defendant American Alloy Steel, Inc. is a Texas corporation engaging in interstate commerce through the purchase and sale of steel products and conducting business in this State.  Summons may be served upon its registered agent, Defendant Arthur J. Moore at 6230 North Houston Rosslyn Road, Houston, Texas 77091, or wherever else he may be found.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 33, and therefore denies them.

34.     Defendant Arthur J. Moore is an individual and Texas resident.  He may be served summons at his place of business, 6230 North Houston Rosslyn Road, Houston, Texas

77091, or wherever else he may be found.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 34, and therefore denies them.

35.     Defendant JSW Steel (USA) Inc. is a Texas corporation engaging in interstate commerce through the purchase and sale of steel products and conducting business in this State. Summons may be served upon its registered agent, Corporation Service Company d/b/a CSC—Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218, or wherever else it may be found.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 35, and therefore denies them.

36.     Defendant Nucor Corporation is a foreign corporation engaging in interstate commerce through the purchase and sale of steel products and conducting business in this State. Summons may be served upon its registered agent, C T Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234, or wherever else it may be found.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 36, and therefore denies them.

37.     Defendant SSAB Enterprises, LLC d/b/a SSAB Americas is a foreign corporation engaging in interstate commerce through the purchase and sale of steel products and conducting business in this State.  It is headquartered at 801 Warrenville Road, Suite 800, Lisle, Illinois 60532.  It may be served summons at that location or wherever else it may be found.

**ANSWER:**     SSAB admits the allegations of Paragraph 37.

38.     Various persons, firms, and corporations, who are known or unknown to

14

Plaintiff MM Steel, and not named as defendants in this action, including senior executives of the Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy in violation of the laws asserted herein.

**ANSWER:** SSAB denies the allegations of Paragraph 38.

39. In this Complaint, whenever reference is made to any act of any corporation or entity, the allegation means that the corporation or entity engaged in the act by or through its officers, directors, agents, owners, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or entity's business or affairs.

**ANSWER:** The allegations of Paragraph 39 are definitional and do not require a response. To the extent an answer is required, SSAB denies the allegations of Paragraph 39.

40. The activities of Defendants and their co-conspirators were within the flow of and substantially affected interstate commerce, namely the sale and purchase of steel products.

**ANSWER:** The allegations of Paragraph 40 purport to state a legal conclusion to which an answer is not required. To the extent an answer is required, SSAB denies the allegations of Paragraph 40. To the extent that the allegations of Paragraph 40 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.

41. And the conspiracy described herein between and among Defendants and their co-conspirators had a direct, substantial and reasonably foreseeable impact on United States commerce.

**ANSWER:** The allegations of Paragraph 41 purport to state a legal conclusion to which an answer is not required. To the extent an answer is required, SSAB denies the

allegations of Paragraph 41.  To the extent that the allegations of Paragraph 41 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies the remaining allegations of Paragraph 41.

42.     Raw steel, an alloy of iron and carbon, is a commodity good that is the primary input for a variety of steel products manufactured and sold by Defendants in the United States.  Defendants JSW, Nucor, and SSAB manufacture raw steel, which they convert into steel products such as flat sheets, coils, plates, beams, rails, bars, rods, wire, wire rods, or pipes for sale to purchasers, both metals service centers and end users, in a variety of industries.  These Defendants operate mills in Texas, Alabama, and North Carolina, among other states and countries.

**ANSWER:**     SSAB admits that it manufactures various steel products for sale to purchasers in a variety of industries, and further admits that it operates mills in the United States and in other countries, and that it operates a mill in Alabama.  SSAB denies that it manufactures "raw steel" or that "raw steel" is a commodity good.  To the extent that the allegations of Paragraph 42 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 42.

43.     Defendants Reliance/Chapel and American Alloy, which is owned by Defendant Moore, sell steel products at metals service centers.  They are competitors of each other and Plaintiff MM Steel.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 43, and therefore denies them.

16

44.     Such centers function as distributors of steel, usually at a markup, to manufacturers of steel products or to other intermittent entities.   Because steel products are many—the many grades of metals and the varying thickness and sizes of materials results in large permutations of available products—distributors specialize in both the types of steel they market and the services (processing) they perform.

**ANSWER:**     SSAB admits that metals service centers distribute steel to manufacturers of steel products and to other entities, and that there are many different types and grades of steel products.  SSAB denies all remaining allegations of Paragraph 44.

45.     Service centers are the largest customer group for steel mills, taking nearly 50% of all the carbon, alloy, stainless and specialty steels, aluminum, copper, brass, and bronze, and superalloys produced in the United States.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 45, and therefore denies them.

46.     Reliance and Chapel are metals service centers.  Reliance "is the largest metals service center company in North America."  According to its December 2011 10-K, its "network of metals service centers operates more than 220 locations in 38 states" and nine foreign countries.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 46, and therefore denies them.

47.     Through its network, Reliance provides "metals processing services and distribute[s] a full line of more than 100,000 metal products, including alloy, aluminum, brass, copper, carbon steel, stainless steel, titanium and specialty steel products, to more than 125,000 customers in a broad range of industries."

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 47, and therefore denies them.

48.     In Houston alone, Reliance operates the following companies that presumably compete  against each other  and process and distribute steel products:  Chapel (carbon  steel plates); Delta Steel (carbon steel bar, flat-rolled, plate, structural and tubing); EMJ Metals (specialty bar and tubing); Metals Supply Company (carbon steel bar, flat-rolled, plate, structural and tubing); and Precision Flamecutting & Steel (carbon, alloy, and HSLA steel plate).

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 48, and therefore denies them.

49.     The metals service center business is all about relationships and meeting customer demands.  Some customers, for example, buy mainly domestic steel; others may need product on short notice.  Those facts coupled with the location of steel mills, specialization of products (domestic versus import; grades; sizes; etc.) and shipping costs means that not all mills are interchangeable (given the shipping costs, a mill in, say, Seattle, will have a hard time competing with a mill in Baytown on similar products sold in Houston; and it may not want to if it can sell the same steel in Seattle without having to incur the additional shipping costs that impact its bottom line).  Therefore, when a company like Plaintiff MM Steel intends to compete in the Houston or Southwest region, access to the products of and relationships with the few mills that as a practical matter provide steel products in its market are key.

**ANSWER:**     SSAB admits the allegations of the first two sentences of Paragraph 49. SSAB denies all remaining allegations of Paragraph 49.

50.     Unlike, say, the purchase of Tide detergent, a customer who wants a specific

steel product (of material, grade, size and quantity) within a specific time period, cannot simply

walk into any Wal-Mart or Target (any mill or metals service center in the country) and be

assured that it (unlike Tide or a discount store-brand) will be stocked or made available at a

competitive price.  Reliance's December 2011 10-K describes the customers and market

correctly when it states:

> Our customers purchase from us and other metals service centers to obtain
>
> value added metals processing, readily available inventory, reliable and timely
>
> delivery, flexible minimum order size and quality control.  Many of our
>
> customers deal exclusively with service centers because the quantities of metal
>
> products that they purchase are smaller than the minimum orders specified by
>
> mills, because those customers require intermittent deliveries over long or
>
> irregular periods, or because those customers require specialized processing
>
> services.  We believe that metals service centers have also enjoyed an
>
> increasing share of total metal shipments due to the focus of the capital goods
>
> and other manufacturing industries on just-in- time inventory management
>
> and materials management outsourcing, and because metal producers have
>
> reduced in-house direct sales efforts to small sporadic purchasers in order to
>
> enhance their production efficiency.  The consolidation of carbon steel mills
>
> that occurred during the 2001 to 2003 period further reduced the number of
>
> potential sources of metal available to customers purchasing small quantities of
>
> metal.

**ANSWER:**    SSAB admits that steel products are not comparable to Tide detergent and

that customers interested in purchasing steel products cannot simply walk into a Wal-Mart or

Target and find steel products available for purchase there.  SSAB lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 50, and therefore denies them.

51.     The Gulf Coast region is, as one can imagine given the energy industry, the Houston port, and ancillary businesses, a large market for buying and selling steel.

**ANSWER:**     SSAB admits that "the Gulf Coast region" is "a large market for buying and selling steel" but denies that "the Gulf Coast region" is a relevant market for antitrust purposes.  SSAB denies all remaining allegations of Paragraph 51.

52.     By 1999, Hume and Schultz had been in the steel business for decades collectively and built great relationships, both among customers and steel mills.  At the time, Hume and Schultz worked for Defendant American Alloy.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 52, and therefore denies them.

53.     Chapel did not have an office in Houston until 1999, though it sold steel products in the Houston market and desired a larger presence.  To obtain that Houston presence, Chapel's then owner, James Sutow, heavily recruited Hume and Schultz, who eventually left American Alloy to start Chapel's Houston metals service center.  Within a couple or so years, Chapel's Houston center became one of its most successful in the country and had remained so even after Reliance purchased Chapel in 2004.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 53, and therefore denies them.

54.     Schultz in particular is highly respected within the industry for his technical knowledge.  He has had a major influence on product specifications and certifications,

which allow metals service centers to consolidate some inventory, thus resulting in reduced costs and increased profits.   His close relationship with some of the biggest customers in the region, including Kiewit Offshore Services, Gulf Island Fabrication, McDermott and Keppel AmFELS, for example, poses a great threat to Reliance/Chapel and American Alloy, among others.

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 54, and therefore denies them.

55.   The undisputed evidence will show that Schultz's and Hume's combined expertise and experience had a favorable impact on American Alloy's business before their departure for Chapel in 1999 and Chapel's thereafter.

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 55, and therefore denies them.

56.   Plaintiff MM Steel started doing business on September 1, 2011, though its operation was brought to a halt on September 15, 2011 when Chapel obtained a temporary restraining order against Hume, Schultz, and two of MM Steel's employees based on alleged covenants not to compete.  That case was settled, with an agreed permanent injunction prohibiting MM Steel and its employees from soliciting a select list of Chapel customers until March 15, 2012, when the agreed permanent injunction would terminate.

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 56, and therefore denies them.

57.   Setting aside MM Steel's (and Hume's and Schultz's) view of the merits or the motivation behind Chapel's state court lawsuit, it was assumed by them that upon the execution of the settlement in the state court action, MM Steel would be able to go about its

business of competing with Reliance/Chapel, American Alloy, and other competitors.  MM Steel's assumption was based on the terms of the agreed permanent injunction, which only prohibited the solicitation of a select group of Chapel's customers.  However, Plaintiff MM Steel  was wrong in its assumption because Defendants here had other ideas.  Indeed, MM Steel now knows the settlement and the injunction were a sham and fraudulently induced, because the other side never had any intention of allowing MM Steel to compete, even subject to an injunction.

**ANSWER:**    To the extent that the allegations of Paragraph 57 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 57.

58.    "We will sell at costs, if necessary, to take business away from these bums [Hume and Schultz].  I plan to have a conversation with the President of Reliance," wrote Defendant Moore in an email to his employees.  Gregg J. Mollins is the President of Reliance.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 58, and therefore denies them.

59.    The evidence will show that American Alloy's Moore and Jo Ann Kotzur "were invited to meet with Stan Altman, President of Chapel" to form an agreement to "take  all available courses of action, legally and otherwise, including notifying any mill that is selling them, that they can no longer expect any future business from Chapel/Reliance… They will have a rough go of the futue [sic] in the steel industry."

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 59, and therefore denies them.

60.      Moreover, in furtherance of the agreement and conspiracy, Defendant
Moore offered Reliance/Chapel his full cooperation.  "Now that these bums are no longer with
Chapel, I informed Stan that [American Alloy] would welcome their inquiries and orders,"
wrote Moore in an email.  "While Chapel competes with us in several grades, mostly the as
rolled, they can be a good source for us on some of the A.R. grades."  In other words, despite
American Alloy's 12- plus years' refusal to do business with Chapel, the desire to engage in a
group boycott of Plaintiff MM Steel had led to an alliance of competitors.

**ANSWER:**    To the extent that the allegations of Paragraph 60 relate to persons or
entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about
the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations
of Paragraph 60.

61.      Evidently, Reliance/Chapel and American Alloy were not satisfied with the
settlement (the injunction) in the state court action and the toll it took on MM Steel, leaving
only Hume and Schultz to sell steel.  Not long after the ink had dried on the settlement and the
agreed permanent injunction, a concerted campaign by the Defendants to squash a competitor
commenced.

**ANSWER:**    To the extent that the allegations of Paragraph 61 relate to persons or
entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about
the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations
of Paragraph 61.

62.      None of this was known to Plaintiff MM Steel, so it naturally resumed doing
business, albeit subject to an agreed permanent injunction.  In mid-October 2011, MM Steel
attempted to purchase additional steel from JSW.   JSW and Plaintiff MM Steel had entered

into a one-year agreement in August 2011.  Among other terms, that agreement required "MM Steel … to attempt to buy, or caused to be bought [from JSW], a minimum of 500 tons per month average at a price as agreed upon by both parties."  In turn, JSW agreed "to supply this quantity as per the MM Steel's requirements and material specification guidelines …"  JSW had already sold steel to MM Steel under their agreement.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 62, and therefore denies them.

63.    However, at the meeting in October 2011, JSW's President, Mike Fitch, and Rajesh Khosla, a JSW salesman, told Plaintiff MM Steel that JSW would no longer honor its contract.  This was because, according to Fitch, multiple persons had made "unsolicited" visits to JSW to disparage Hume, Schultz, and MM Steel.  Because of those unsolicited visits, JSW cut off supply to MM Steel.  Hume told Fitch that he was effectively putting MM Steel out of business.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 63, and therefore denies them.

64.    When Hume told Fitch that he (Hume) sensed Fitch and JSW had been threatened, Fitch's only response was this:  "I understand the gravity of the situation," but "I have to do what's best for my business."  The end result was that despite an existing contract and an established business relationship with Hume and Schultz, JSW was going to enter into a conspiracy to shut down MM Steel, not to mention breach its contract.  Plaintiff has recently learned that Defendants American Alloy and Moore threatened JSW.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 64, and therefore denies them.

65.     MM Steel, of course, reached out to other steel mills with which it had relationships, including SSAB and Nucor.  The results were the same.  Initially, SSAB had quoted prices and was in the process of setting up a line of credit for MM Steel.  Indeed, SSAB's Steve Dunn, the main contact for MM Steel, was very excited for Hume and Schultz.

**ANSWER:**     SSAB admits that Hume and Schultz communicated with Steve Dunn.  To the extent that the allegations of Paragraph 65 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 65.

66.     After JSW cut off MM Steel, Hume reached out again to Dunn to buy steel from SSAB.  Hume and Dunn met in person to talk about SSAB selling steel to MM Steel.  When Hume asked Dunn why SSAB was not quoting MM Steel, Dunn said the higher ups at SSAB did not want to find themselves sitting in a meeting with Reliance/Chapel and having to answer questions about doing business with Plaintiff MM Steel.  Apparently it was easier for SSAB to engage in the group boycott.

**ANSWER:**     SSAB admits that Hume communicated and met with Steve Dunn.  To the extent that the allegations of Paragraph 66 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 66.

67.     MM Steel continued to push for business with SSAB, but it was clear that it was not up to Dunn, because, according to him, "It's a real political football and I need to be careful how I approach this."  Despite repeated inquiries from Plaintiff MM Steel, SSAB refused to do business with it.

**ANSWER:**   SSAB admits that the quotation in the first sentence of Paragraph 67 is derived from an e-mail to or from Steve Dunn, but states that the quoted language is incomplete and taken out of context.  SSAB admits that it has declined to sell steel to MM Steel.  SSAB denies all remaining allegations of Paragraph 67.

68.    MM Steel also reached out to Nucor in October and November 2011, namely through Lisa McCollum, with whom MM Steel's principals have had a long-term business relationship.  Nucor would not even respond to MM Steel's inquiries.

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 68, and therefore denies them.

69.    By December 2011, MM Steel's fate appeared to be sealed.  It therefore appealed to a well-established customer, North Shore Supply (North Shore), in an effort to get around Defendants' group boycott.

**ANSWER:**   To the extent that the allegations of Paragraph 69 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 69.

70.    North Shore agreed to buy steel on behalf of MM Steel at a small markup and to also allow it to sell North Shore's inventory of steel, with North Shore paying MM Steel a commission on the sale.

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 70, and therefore denies them.

71.    Although partnering with North Shore was not the American dream of ownership or financial success Hume and Schultz had envisioned for themselves and Plaintiff

MM Steel, it was, in their view, enough to keep it going until perhaps the alliance between Reliance/Chapel and American Alloy dissipated. But it soon became clear that the conspiracy did not have a short-term goal.

**ANSWER:**     To the extent that the allegations of Paragraph 71 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them. SSAB denies all remaining allegations of Paragraph 71.

72.     Starting in December 2011 and continuing into January, February and March 2012, North Shore was repeatedly threatened and harassed by Nucor, Reliance/Chapel, and American Alloy.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 72, and therefore denies them.

73.     In late 2011, Nucor discovered that North Shore was in fact purchasing steel for MM Steel. Nucor's Jerrell Vinson, a District Manager, contacted North Shore's Byron Cooper in December 2011 and said that he (Nucor) could not sell steel to Plaintiff MM Steel. North Shore's Cooper was concerned enough to tell Hume and Schultz that he "can't do anymore Nucor orders that ship directly to you guys." Despite Vinson's threat, North Shore remained interested in continuing to work with Hume and Schultz, given their past success and the potential for financial gain.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 73, and therefore denies them.

74.     Thus, in January 2012, Hume and Schultz continued their talks with North Shore, largely about growing their partnership, given that MM Steel was being "blacklisted."

It was never an issue whether Plaintiff MM Steel could generate business.  The only obstacle was the group boycott.

**ANSWER:**    To the extent that the allegations of Paragraph 74 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 74.

75.    In early February 2012, North Shore and MM Steel, who now had access to North Shore's inventory, were finalizing a memorandum of understanding regarding their partnership.  Again, while this would have provided Hume and Schultz a living, it was now clear that their dream of ownership had been destroyed by Defendants' concerted actions.

**ANSWER:**    To the extent that the allegations of Paragraph 75 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 75.

76.    Not long after that, however, Chapel's Ginny Lindsey contacted Leslie Brown of North Shore and questioned Brown about the relationship between Plaintiff MM Steel and North Shore. Lindsey said that Chapel had an internal meeting concerning MM Steel and North Shore's business partnership, the suggestion being that a continuation of that relationship would bode ill for North Shore.  Leslie relayed the conversation to her boss, Byron Cooper of North Shore.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 76, and therefore denies them.

77.    In early March 2012, North Shore and Defendant Nucor had a meeting in

Houston about growing their relationship.  This included Nucor selling products directly to North Shore's sister-company Greens Bayou Pipe Mill (Greens Bayou).  Up to that point, Nucor had directed Greens Bayou to distributors such as Chapel and Ranger Steel.  Cutting out the middle man such as Chapel and Ranger Steel carried great weight with North Shore and Greens Bayou.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 77, and therefore denies them.

78.    At the meeting were representatives of Greens Bayou, North Shore's Cooper, its President Buzzy Bluestone, Nucor's Jeff Whiteman, a high level executive, Jerrell Vinson, and Phil Bischof, a Nucor product specialist.  After the meeting was over, they all headed to a group lunch.  As they were about to drive off, Vinson jumped into Cooper's car.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 78, and therefore denies them.

79.    Vinson told Cooper that any ongoing relationship between North Shore and MM Steel would be an "issue" for Nucor, implying that if North Shore continued its relationship with MM Steel or Hume or Schultz, North Shore would lose Nucor's support, not only with respect to direct sales to North Shore but Nucor's proposal relating to Greens Bayou. Given North Shore's and MM Steel's ongoing business discussions, Cooper relayed that conversation to Hume and Schultz, and also conveyed his own concerns.  Cooper said he would contact Nucor's Whiteman to discuss the issue further.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 79, and therefore denies them.

80.    Despite repeated attempts, Whiteman was not returning Cooper's calls.

Before Cooper and Whiteman eventually talked, however, Cooper had another discussion with Vinson on Monday March 19, 2012.  Vinson called Cooper and again raised the issue of Plaintiff MM Steel and mentioned a meeting at Nucor about MM Steel.  Vinson also specifically referenced the agreed permanent injunction between Chapel and MM Steel, Hume, and Schultz, and the fact that it had terminated on March 15, allowing Plaintiff MM Steel to compete without any restrictions.  The injunction had nothing to do with Nucor.  Cooper told Vinson he needed to discuss the issue further with Whiteman.

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 80, and therefore denies them.

81.    Later that morning, Cooper finally got a hold of Whiteman.  Whiteman was very careful in his choice of words, but he made it clear that "all eyes were on" MM Steel.  Whiteman mentioned "Mittal, JSW, Nucor, Reliance, Chapel … American Alloy, and Ranger" as "monitoring" Plaintiff MM Steel.  He further stated that "the powers that be at Nucor would not sell steel" to MM Steel.  Whiteman was very clear in stating that should North Shore continue doing any business with MM Steel, even simply employing Hume and Schultz, Nucor would stop selling it steel.  According to Whiteman, MM Steel was on everyone's radar and being watched closely, and that no mill would support MM Steel or anyone who did business with it.  Whiteman also said that although he had no problem with Hume and Schultz, he was given a "mandate" from his higher ups at Nucor to not support Plaintiff MM Steel because of Reliance, Nucor's biggest customer.  Furthermore, Whiteman told Cooper that Reliance/Chapel, American Alloy, and Ranger Steel are "terrified" that Plaintiff MM Steel will take business away from them. Like Vinson, Whiteman also brought up March 15 as having been the last day of the agreed permanent injunction.  In that context, Whiteman said

that Reliance/Chapel, American Alloy, and Ranger Steel could not stop MM Steel from going after that business, but they (Defendants) could cut off Plaintiff MM Steel's supply of steel.

**ANSWER:**   To the extent that the allegations of Paragraph 81 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 81.

82.    Not long afterward, American Alloy also threatened North Shore, and the timing of its *parallel action* is more evidence about the horizontal agreement between American Alloy and Reliance/Chapel to engage in a group boycott of Plaintiff MM Steel.  After all, Defendant Moore's emails already show that he had meetings with the Presidents of Chapel and Reliance, among other high level executives, on the subject of threatening "any mill that is selling [Plaintiff MM Steel]" with the loss of business from Reliance/Chapel and American Alloy.

**ANSWER:**   The first sentence of Paragraph 82 purports to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of the first sentence of Paragraph 82.  SSAB lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 82, and therefore denies them.

83.    In late March, American Alloy's Wendell Hilton set up a lunch meeting with North Shore's Cooper.  During that meeting, Hilton asked Cooper about any relationship between North Shore and MM Steel.  Cooper was told that should North Shore continue to have any relationship with MM Steel, Hume, or Schultz, American Alloy's Moore would put an end to any relationship between American Alloy and North Shore.  North Shore is one of

American Alloy's customers.  Hilton also stated that Defendant Moore had contacts at all of the mills and would use them, especially his contacts at ArcelorMittal, against MM Steel and North Shore and anyone else who worked with MM Steel.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 83, and therefore denies them.

84.    The *same day* Hilton was setting up the  lunch meeting with Cooper, Ginny Lindsey of Chapel was calling Buzzy Bluestone, the president of North Shore, to set up a meeting.  Given Lindsey's and Bluestone's positions within their respective companies, they would have no reason to set up a meeting, and despite repeated calls by Lindsey to Bluestone, he did not return her calls.  North Shore believes that Lindsey, who formerly worked for American Alloy, was intending to exert the same kind of pressure on it that American Alloy's Hilton had when he met with Cooper.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 84, and therefore denies them.

85.    As of the filing of this Complaint, MM Steel is effectively shut down because it cannot buy steel from those mills with whom it had ongoing relationships and which would allow it to compete in the market.  North Shore, having been threatened and fearing the ruin of its business from losing Nucor's and other mills' support, has told MM Steel it is time "to shut things down" between them.  North Shore's Cooper has said that Nucor's Whiteman "controls our destiny," and that North Shore is very concerned about losing other mills' support due to American Alloy's and Reliance/Chapel's "illegal" group boycott.  North Shore is also concerned about losing JSW's support because JSW is one of Greens Bayou's biggest vendors.

**ANSWER:**   SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 85, and therefore denies them.

86.   Given North Shore's expectations of sales in the mid-eight figures within a short period of time after collaborating with MM Steel, its decision to terminate the relationship speaks volumes about the gravity of the threats to its business from Defendants. Despite how things have unfolded, both Hume and Schultz have nothing but praise and respect for Cooper and North Shore.

**ANSWER:**   To the extent that the allegations of Paragraph 86 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 86.

87.   Many other facts will be revealed and discovered during the course of this litigation that will establish Defendants' illegal, concerted actions.  Still, one additional circumstance deserves attention here, because it illustrates the conspiracy's reach and Defendants' confidence that they can act with impunity.

**ANSWER:**   To the extent that the allegations of Paragraph 87 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 87.

88.   In January 2012, Stephen Koch of Reliance called Hume.  Koch said he had been contacted by Nucor because someone named Gary Stein of Triple S had contacted Nucor to inquire about whether he (Stein) could hire Hume or Schultz.  (Neither Schultz nor Hume has spoken to Stein about a job.)  Koch told Hume that if Hume and Schultz were thinking

about working for anyone else, Reliance should be part of those discussions.  The call also made it clear to Hume and Schultz that Reliance/Chapel had gone to great lengths, in furtherance of the conspiracy, to make sure the group boycott was effective; to the point where even third parties with no relation to Plaintiff MM Steel or the Defendants were in fear of dealing with Plaintiff MM Steel, lest they face the wrath of Defendants' concerted actions.

**ANSWER:**     To the extent that the allegations of Paragraph 88 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 88.

89.     Plaintiff incorporates all preceding paragraphs as if repeated herein verbatim.

**ANSWER:**     SSAB incorporates its answers to all preceding paragraphs as if fully restated herein.

90.     Beginning within the past year and until the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to a naked restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §§ 1 & 15.

**ANSWER:**     The allegations of Paragraph 90 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 90.

91.     The combination and conspiracy consisted of an agreement or agreements among Defendants and their co-conspirators to engage in a group boycott of Plaintiff MM Steel.  As described more fully above, Defendants and their co-conspirators entered into horizontal and related agreements to harm MM Steel by depriving it of its ability to purchase or

sell steel.

**ANSWER:**    The allegations of Paragraph 91 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 91.

92.    Those agreements among Defendants and their co-conspirators are conclusively presumed to be unreasonable and therefore illegal under Section 1 of the Sherman Act because of their pernicious effect on competition and lack of any redeeming virtue.

**ANSWER:**    The allegations of Paragraph 92 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 92.

93.    With respect to Defendants Reliance and Chapel, and in light of *Copperweld Corp. v.* Independence *Tube Corp.*, 467 U.S. 752 (1984), each is alleged to have conspired with the other Defendants in violation of Section 1 of the Sherman Act.

**ANSWER:**    The allegations of Paragraph 93 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 93.

94.    With respect to the individual Defendant Moore, and perhaps others to be named later, his actions constitute an independent personal stake in achieving the objective of the conspiracy, namely in restraining the trade or commerce of MM Steel, Hume, and Schultz.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 94, and therefore denies them.

95.    Defendant Moore individually participated in the alleged conduct in violation

of Section 1 of the Sherman Act. Moore, with the requisite knowledge and intent, organized meetings among Defendants in furtherance of the group boycott.  He discussed with executives of Reliance and Chapel the specific intent to devise a scheme to carry out the group boycott.

**ANSWER:**    To the extent that the allegations of Paragraph 95 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 95.

96.    Defendant Moore also, either directly or by asking his employees to carry out his schemes in furtherance of the group boycott, threatened other Defendants and third parties with punitive measures should they maintain a business relationship with Plaintiff MM Steel.

**ANSWER:**    SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 96, and therefore denies them.

97.    As a result of Defendants' actions, Plaintiff MM Steel has suffered antitrust injury.

**ANSWER:**    The allegations of Paragraph 97 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 97.

98.    Plaintiffs incorporate all preceding paragraphs as if repeated herein verbatim.

**ANSWER:**    SSAB incorporates its answers to all preceding paragraphs as if fully restated herein.

99.    Plaintiff MM Steel and JSW entered into a valid, enforceable agreement that JSW breached, causing Plaintiff contract damages, including actual and consequential damages.

**ANSWER:**     SSAB lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 99, and therefore denies them.

100.     Plaintiff incorporates all preceding paragraphs as if repeated herein verbatim.

**ANSWER:**     SSAB incorporates its answers to all preceding paragraphs as if fully restated herein.

101.     Plaintiff MM Steel had valid agreements with JSW and North Shore that Defendants willfully and intentionally interfered with, and such interference proximately caused MM Steel injury.

**ANSWER:**     The allegations of Paragraph 101 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 101.

102.     Plaintiff MM Steel has suffered actual damages and loss because of Defendants' tortious interference.

**ANSWER:**     The allegations of Paragraph 102 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 102.

103.     Plaintiff MM Steel seeks exemplary damages for Defendants' tortious conduct pursuant to Section 41.003 of the Texas Civil Practices and Remedies Code.

**ANSWER:**     SSAB admits that Plaintiff seeks exemplary damages but denies the remaining allegations of Paragraph 103, and further denies that Plaintiff is entitled to damages of any sort.

104.     Plaintiff incorporates all preceding paragraphs as if repeated herein verbatim.

**ANSWER:**     SSAB incorporates its answers to all preceding paragraphs as if fully

restated herein.

105.    There was a reasonable possibility that Plaintiff MM Steel would have entered into business relationships with SSAB, Nucor, and third parties or continued the business relationship with JSW but for Defendants' tortious or unlawful conduct, which included violating the Sherman and Clayton Acts and committing business disparagement.

**ANSWER:**    To the extent that the allegations of Paragraph 105 relate to persons or entities other than SSAB, SSAB lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them.  SSAB denies all remaining allegations of Paragraph 105.

106.    Defendants' tortious and unlawful conduct caused Plaintiff MM Steel to suffer actual damages and other losses.

**ANSWER:**    The allegations of Paragraph 106 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 106.

107.    Plaintiff MM Steel seeks exemplary damages for Defendants' tortious conduct pursuant to Section 41.003 of the Texas Civil Practices and Remedies Code.

**ANSWER:**    SSAB admits that Plaintiff seeks exemplary damages but denies the remaining allegations of Paragraph 107, and further denies that Plaintiff is entitled to damages of any sort.

108.    Plaintiff incorporates all preceding paragraphs as if repeated herein verbatim.

**ANSWER:**    SSAB incorporates its answers to all preceding paragraphs as if fully restated herein.

109.    Defendants published disparaging words about Plaintiff MM Steel's economic

interests, and those words were false.  Defendants published the words with malice and without privilege.

**ANSWER:**     The allegations of Paragraph 109 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 109.

110.     Defendants' tortious conduct caused Plaintiff MM Steel to suffer actual damages and other special damages.

**ANSWER:**     The allegations of Paragraph 110 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 110.

111.     Plaintiff MM Steel seeks exemplary damages for Defendants' tortious conduct pursuant to Section 41.003 of the Texas Civil Practices and Remedies Code.

**ANSWER:**     SSAB admits that Plaintiff seeks exemplary damages but denies the remaining allegations of Paragraph 111, and further denies that Plaintiff is entitled to damages of any sort.

112.     Plaintiff incorporates all preceding paragraphs as if repeated herein verbatim.

**ANSWER:**     SSAB incorporates its answers to all preceding paragraphs as if fully restated herein.

113.     Defendants in combination with each other agreed to commit various torts against Plaintiff MM Steel, including tortious interference with its existing and prospective contracts and committing business disparagement, among other wrongful acts.  Plaintiff MM Steel has suffered harm as a result of such conduct.

**ANSWER:**     The allegations of Paragraph 113 purport to state a legal conclusion to

which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 113.

114.    The unlawful conspiracy has had the effect of restraining, suppressing, and eliminating competition in the sale of steel products in all markets in which Plaintiff MM Steel did and could operate in interstate commerce.

**ANSWER:**    The allegations of Paragraph 114 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 114.

115.    As a direct and proximate result of the illegal combinations, contracts, or conspiracy, which will be established with a reasonable degree of certainty, Plaintiff MM Steel has been injured and financially damaged in its respective business and property, in amounts that are presently undetermined, but that Plaintiff MM Steel anticipates, given Hume's and Schultz's expertise and experience, among other facts, to be in the nine-figures pre-trebling, pursuant to Section 4 of the Clayton Act.

**ANSWER:**    The allegations of Paragraph 115 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 115.

116.    Under *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), and its progeny, damages for the total or partial exclusion of a competitor from the market reflects antitrust injury.

**ANSWER:**    The allegations of Paragraph 116 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 116.

117.    Moreover, where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations would be likely to cause.

**ANSWER:**    The allegations of Paragraph 117 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 117.

118.    Plaintiff MM Steel is entitled to an award of attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.  Plaintiff is further entitled to reasonable and necessary fees from Defendant JSW for its breach of contract pursuant Chapter 38 of the Texas Civil Practices and Remedies Code.   All conditions precedent have either been satisfied or become moot under the circumstances.

**ANSWER:**    The allegations of Paragraph 118 purport to state a legal conclusion to which an answer is not required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 118.

119.    Pursuant to the U.S. Const. amend. 7, Federal Rule of Civil Procedure 38, and Local Rule 38.1, Plaintiff MM Steel hereby demands a trial by jury on all issues of fact.

**ANSWER:**    Paragraph 119 demands a trial by jury, to which no response is required.  To the extent an answer is required, SSAB denies the allegations of Paragraph 119.

120.    Plaintiff MM Steel respectfully prays as follows:

a.    That the contracts, combinations, or conspiracy, and the acts done in furtherance of that conspiracy by Defendants and their co-conspirators, be adjudged to have been *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.  That judgment be entered for Plaintiff MM Steel against Defendants for three times the amount of actual damages sustained;

c.  That all Defendants shall be held jointly and severally liable for all damages, costs, and attorneys' fees assessed against them;

d.  That Plaintiff MM Steel recover special and exemplary damages;

e.  That Plaintiff MM Steel recover from Defendants all costs of Court and attorneys' fees;

f.  That Plaintiff MM Steel be awarded pre- and post-judgment interest at the highest legal rate; and

g.  That Plaintiff MM Steel receives such other relief as the Court may deem just and proper under law or equity.

**ANSWER:**      SSAB admits that Paragraph 120 describes MM Steel's prayer for relief, but denies that the Complaint states a claim and that Plaintiff is entitled to any relief whatsoever.

## SSAB'S AFFIRMATIVE DEFENSES

In further answer to the Complaint, SSAB states that Plaintiff's claims are barred in whole or in part by the following defenses. SSAB does not assume the burden of proof on any such defenses that would otherwise rest on Plaintiff. SSAB has not knowingly or intentionally waived any applicable affirmative or other defenses. SSAB reserves the right to amend its Answer and/or to assert and rely upon such other defenses as may become available or apparent during discovery in this case.

## FIRST DEFENSE

Plaintiff's claims and prayers for relief are barred, in whole or in part, for failure to state a claim on which relief can be granted.

## SECOND DEFENSE

Plaintiff's claims and prayers for relief are barred, in whole or in part, because Plaintiff suffered no injuries or damages as a result of the conduct alleged in the Complaint.

## THIRD DEFENSE

Plaintiff's claims and prayers for relief are barred, in whole or in part, because its alleged injuries and damages are remote and speculative and are therefore not recoverable.

## FOURTH DEFENSE

Plaintiff's claims and prayers for relief are barred, in whole or in part, by the doctrine of unclean hands, in pari delicto, waiver, or estoppel.

## FIFTH DEFENSE

Plaintiff's claims and prayers for relief are barred, in whole or in part, because it failed to mitigate its alleged injuries and by the doctrine of avoidable consequences.

## SIXTH DEFENSE

Some or all of Plaintiff's claims are barred because it has not suffered antitrust injury proximately caused by conduct of SSAB, or has not suffered, and will not suffer, injury of the type the antitrust laws were designed to prevent.

## SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because the conduct of which Plaintiff complains has not, and will not, unreasonably restrain trade or commerce.

## EIGHTH DEFENSE

SSAB's actions challenged by Plaintiff were justified, constituted bona fide business competition, and were carried out in furtherance of SSAB's legitimate business interests.

## NINTH DEFENSE

SSAB adopts by reference any applicable defense pleaded by any other defendant that is not otherwise expressly set forth in this Answer to the extent such defense is not inconsistent with SSAB's defenses set forth herein.

Dated:  December 21, 2012

Respectfully submitted,

s/ Steven R. Selsberg

Steven R. Selsberg,
ATTORNEY IN CHARGE
Texas Bar No. 18021550
Southern District Bar No.  9738
SIDLEY AUSTIN LLP
600 Travis Street, Suite 3100
Houston, TX 77002
Tel:  (713) 315-9006
Fax:  (713) 315-9199
sselsberg@sidley.com

OF COUNSEL:

John W. Treece (Admitted *Pro Hac Vice*)
Illinois Bar No. 3122889
Scott D. Stein (Admitted *Pro Hac Vice*)
Illinois Bar No. 6256725
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
jtreece@sidley.com
sstein@sidley.com
*Attorneys for Defendant SSAB Enterprises, LLC d/b/a SSAB Americas*

## CERTIFICATE OF FILING AND SERVICE

I certify that that on December 21, 2012, I electronically transmitted the foregoing to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

s/ Steven R. Selsberg
Steven R. Selsberg
ATTORNEY IN CHARGE
Texas Bar No. 18021550
Southern District Bar No.  973
SIDLEY AUSTIN LLP
600 Travis Street, Suite 3100
Houston, TX 77002
Tel:  (713) 315-9006
Fax:  (713) 315-9199
sselsberg@sidley.com