UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MM STEEL, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 4:12-CV-01227 |
| | § | |
| RELIANCE STEEL & ALUMINUM CO., | § | |
| CHAPEL STEEL CORP., AMERICAN | § | |
| ALLOY STEEL, INC., ARTHUR J. | § | |
| MOORE, JSW STEEL (USA) INC., | § | |
| NUCOR CORP., AND SSAB ENTERPISES, | § | |
| LLC D/B/A SSAB AMERICAS | § | |
| | § | |
| Defendants. | § | |

_____

**PLAINTIFF MM STEEL'S
MOTION TO REMEDY DEFENSE MISCONDUCT**
_____

This motion is necessary because JSW Steel made the indefensible decision to sneak its counsel into the venire assembly room that only prospective jurors and court personnel may occupy. Without the Court's permission, and without telling plaintiff what it was planning to do, JSW had its lawyer quietly enter the room with the veniremen, unannounced, alone among all counsel in the case. Notepad in hand, the JSW lawyer remained in the jury room watching and critiquing the veniremen for *90 minutes*, while they assembled, interacted, and filled out the jury questionnaire. The lawyer only left after court personnel found out she was present, identified her as a lawyer with no business being there, and told her to leave.

What we know—because JSW now admits this much—is that its counsel evaluated the 35 potential jurors for over an hour, took notes about what she saw, and then reported back to the

entire defense group.  At this point, we do not know what the notes reflect, since JSW classifies the notes—and the later communications among JSW lawyers and then the defense group—as confidential work product protected from disclosure.  And that is precisely the issue:  JSW sent its lawyer into the jury room as part of its defense efforts, to (secretly) gather intelligence about the veniremen to help JSW, and the rest of the defense team, pick a favorable jury.  JSW was looking to gain an edge, even if surreptitiously.

Of course, what is most troubling here is what we can't know.  It is impossible to know what happened while JSW counsel was secreted in the jury room.  Did the lawyer make eye contact with prospective jurors?  Overhear revealing comments or discussions by or among the jurors?  Observe how they were dressed that day, what reading materials they had, or any small personal interactions between them?  Which jurors will recognize the JSW lawyer now, in the courtroom, as the same person in the juror assembly room, and what will they think when they learn she represents JSW?  The prospective jurors naturally assumed they were among court staff authorized to be alone with them.  But if JSW counsel was there, where was plaintiff's counsel?  The list of what we can't know goes on and on.

"The integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Remmer v. United States*, 347 U.S. 227, 229 (1954).  Misconduct has tainted the venire panel and given defendants an unfair advantage.  Fortunately, there is time to remedy the misconduct so the trial can proceed to a fair adjudication.  MM Steel requests that a new venire panel be seated.  In addition, JSW should be ordered to produce its counsel's notes about the prospective jurors, as well as later communications, internally or with other defense counsel, related to its juror observations.  We respectfully move for this relief now, before trial process continues further, so that plaintiff may receive the fair adjudication it deserves.

FACTUAL BACKGROUND

During a pretrial conference on February 6, 2014, the Court notified the parties that, on the previous day, a JSW attorney was in the jury assembly room and observed the venire without authorization. Exh.1 (Taherzadeh Decl.); Exh. 2 (Tabolsky Decl.). The attorney was Emily Miller of Thompson & Knight LLP, who had entered the jury assembly room at the direction of Hunter Barrow, a Thompson & Knight partner. Exh. 1; Exh. 2. When court personnel found that Ms. Miller was present and identified her as a member of the defense team, they told her to leave and brought the issue to the Court's attention. Exh. 1. Neither JSW nor any of the defendants told plaintiff about the incident at any point before the Court did.

In a later call, JSW's lawyers confirmed the following facts: Mr. Barrow directed Ms. Miller to go to the jury assembly room to observe and take notes about the venire members as they assembled and answered the jury questionnaire. Exh. 1; Exh. 2. She did as she was told to do. Exh. 1; Exh. 2. She was in the jury room, unannounced, for at least "90 minutes." Exh. 1; Exh. 2. She did not identify herself (as JSW counsel or otherwise) to court personnel until they confronted her and asked who she was. Exh. 1; Exh. 2. When she said she was a defense attorney (with no authorization to be there), they told her to leave. Exh. 1; Exh. 2. During the (at least) hour and a half she was in the jury room with and watching the venire, she took notes about her observations. Exh. 1; Exh. 2. After leaving, she reported what she observed about the venire to Mr. Barrow. Exh. 1; Exh. 2. He, in turn, reported those observations to Chris Hanslik, David Gersch, and Karl Stern, the lead trial counsel for defendants American Alloy/Moore, Nucor, and Reliance/Chapel, respectively, in a conference call. Exh. 1; Exh. 2.

When asked, JSW refused to divulge Ms. Miller's notes about the venire, or any e-mail or other correspondence with defense counsel regarding the prospective jurors. Exh. 1; Exh. 2;

Exh. 3 (e-mail to Barrow); Exh. 4 (e-mail from Barrow). In response to follow-up e-mails, JSW confirmed that it will not willingly produce its lawyer's juror notes. Exh. 4 ("To be clear and as I told you over the phone on Thursday, I am not going to produce our notes . . . ."); *see* Exh. 3. We asked JSW to preserve the original notes and bring them to the courthouse today, to be available for the Court's inspection. Exh. 2; Exh. 1. JSW said it would do so. Exh. 2; Exh. 1.

Yesterday, we conferred with defense counsel about agreements regarding members of the venire to be excused for hardships, conflicts, or other reasons. Exh. 2. MM Steel was at a disadvantage in this discussion because, while it has the information in the jury questionnaires, defendants also have the benefit of their *ex parte* observations of the venire members. *Id.* Mr. Barrow participated in the telephone discussion for JSW; and Mr. Hanslik and Anne Rodgers (American Alloy/Moore), Mr. Gersch (Nucor), and Mr. Stern (Reliance/Chapel) were present. *Id.* During the discussion, defense counsel took a 20-minute break to caucus privately among themselves. *Id.* When the call reconvened, they announced the strikes they could agree to. *Id.* Before conferring about hardships, we emphasized that plaintiff will object that JSW's misconduct has tainted the jury selection process and venire.

## ARGUMENT & AUTHORITIES

Because impartial jurors are the cornerstone of our system of justice, we "guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." *Remmer v. United States,* 350 U.S. 377, 382 (1956). "The right to an impartial jury in civil cases is inherent in the Seventh Amendment's preservation of a 'right to trial by jury' and the Fifth Amendment's guarantee that 'no person shall be denied of life, liberty or property without due process of law.'" *McCoy v. Goldston*, 652 F.2d 654, 657 (6th Cir. 1981) (quote omitted). In short, "A fair trial before a fair and impartial tribunal . . . is a

4

basic requirement of due process." *Baran v. Port of Beaumont Nav. Dist. of Jefferson Co., Tex.*, 57 F.3d 436, 444 (5th Cir. 1995).

Here, an unauthorized intrusion purposefully made into the jury-selection process has given JSW, and all defendants, an unfair advantage and subjected the eventual members of the jury to undue influence that could skew their decision-making. Now, before the trial process continues further, is the time to remedy the misconduct. Because the entire venire and selection process has been tainted by misconduct, the only adequate remedy is the seating of a new venire. At this stage, it can be done without major disruption, delay, and waste of judicial resources.

JSW's conduct has skewed the impartial administration of justice. Defendants now have an ill-gotten advantage in the jury-selection process. They have the benefit of observations, insights, information, and notes and their subsequent analysis of that data, an edge they already exercised in discussions regarding excusing venire members. For example, defendants surely used this information during the 20-minute private caucus in which they decided which venire members to agree to excuse for cause. *See* Exh. 2. Moreover, JSW, and the other defendants, gained this advantage by conduct deliberately done, without authorization or notice, precisely in order to gain an advantage. They had at least 90 minutes of "alone time" with the roomful of prospective jurors that cannot be recreated now or documented fully.

JSW wanted more time to observe the pool from which the jury will be selected, before it made strikes to venire members or agreed on who to excuse. This was no accident. JSW had its counsel enter the jury room without asking permission or telling anyone, to watch jurors and take notes, without sharing the information with plaintiff, Exh. 4, as valuable *work product* to defend the case. Exh. 1; Exh. 2. JSW then shared its improperly gained information with the defense group. Exh. 1; Exh. 2. Unquestionably, intelligence gleaned in this unprecedented way could

and would be useful in jury selection.  *Cf. McCoy*, 652 F.2d at 657 ("Though an answer on voir dire may not disclose a legal basis for challenge for cause, it 'will be available in the intelligent use of the peremptory challenge.'").

JSW's conduct was unfair not only to MM Steel but to the Court and jurors.  The Court agreed with defendants to use a detailed jury questionnaire, expecting the procedure to save time and provide useful information to both sides.  The Court never intended to advantage either side.  But, adopting the adage that "it's easier to beg forgiveness than ask for permission," JSW saw a way to seize an advantage and decided to take it.  Its conduct was calculated and purposeful, entirely different from inadvertent contact with jurors, for example, in an elevator.  Had it asked permission to monitor the venire *ex parte* in the assembly room, we would have objected and the Court would have refused.  The prospective jurors never suspected they were being monitored by one side in the case, much less an unauthorized monitoring.  The Court had not admonished them about how to act with the parties' counsel present, so they had no forewarning about contact with counsel, being careful about their conversation, and the like.

JSW had no reason to do this if it did not expect to gain an advantage.  And it would not need to assert work product, and refuse to divulge its findings, if the advantage did not depend on the information remaining solely in its possession.  That advantage is not fair or consistent with the impartial administration of justice, which is why such shenanigans are forbidden.  "The qualifications of a juror should be ascertained by questioning in open court in the presence of the parties interested and while the juror is under oath," *Gideon v. United States*, 52 F.2d 427, 429 (8th Cir. 1931), not by secret surveillance by one unannounced party in a room that only prospective jurors and court personnel are authorized to occupy.  Unless a new venire is seated,

6

JSW's strategic objective will be achieved, with potentially broad consequences. Every party will think it is open season on secretly observing jury panels.

Additionally, this *ex parte* presence and contact with eventual jurors may affect their decisions in ways that cannot be predicted. It may have a prejudicial effect on the proceedings after the jury is impaneled. While JSW denies direct verbal communication with any prospective juror, we have only its word for that. *Cf. Ex parte Pilley*, 789 So.2d 888, 891 (Ala. 2000) (as there was "no transcript of the [*ex parte*] conversations between" an attorney and juror and his wife, "we cannot state with certainty the entire content of these conversations"; holding defendant was entitled to a new trial). More important, there are countless means of *non*-verbal communication. Even if JSW had no verbal contact with a venire member, we will never know what smiles, nods, or other gestures occurred. Indeed, her very presence in the room said something to the venire members, who reasonably would have thought that this official-looking person is there with permission. If so, then where is a representative of the plaintiff? What is certain is that we cannot rule out the possibility of prejudicial effect and the resulting taint. *See Roan v. State,* 143 So. 454, 460 (Ala. 1932) ("The test of vitiating influence [of improper contact with a juror] is not that it did influence a member of the jury to act without the evidence, but that it *might* have unlawfully influenced that juror and others with whom he deliberated, and *might* have unlawfully influenced its verdict rendered." (emph. added)). "Not only is a biased decisionmaker constitutionally unacceptable, but our system of law has always endeavored to prevent even the probability of unfairness." *Baran*, 57 F.3d at 444 (quotes omitted).

This misconduct of surreptitiously infiltrating a jury assembly room, outside the purview of the Court or knowledge of the plaintiff, and accumulating secret observations, insights, and notes, violates this Court's rules and practices and the Rules of Professional Conduct. The Texas

Disciplinary Rules, under the heading "Maintaining Integrity of Jury System," forbid a lawyer to "seek to influence a venireman or juror concerning the merits of a pending matter by means prohibited by law or applicable rules of practice or procedure." Tex. Disciplinary R. Prof. Conduct 3.06(a). "There should be no extrajudicial communication with veniremen prior to trial." *Id*. 3.06 cmt. 1. Simply put, "a lawyer connected with the matter may not communicate with or cause another to communicate with anyone he knows to be a member of the venire from which the jury will be selected or any juror or alternate juror, except in the course of official proceedings." 1 McDonald & Carlson, Tex. Civ. Prac. § 2:44. The ABA Rules also forbid such conduct. *See* Model Rules of Prof. Conduct R. 3.5 (A lawyer shall not seek to influence a "juror [or] prospective juror . . . by means prohibited by law" or "communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order.").

Those rules exist for a purpose: "To safeguard the impartiality that is essential to the judicial process, veniremen and jurors should be protected against extraneous influences." Tex. Disciplinary R. Prof. Conduct 3.06 cmt. 1. "The reasons for the ABA's condemnation of such a practice are obvious: unilateral *ex parte* juror contacts can only result in a skewing of the otherwise impartial administration of justice." *State v. Bates,* 508 So.2d 1346, 1350 (La. 1987).

The rules that JSW violated reflect the fact that "[v]exatious or harassing investigations of jurors seriously impair the effectiveness of our jury system. For this reason, a lawyer or anyone on his behalf who conducts an investigation of veniremen or jurors should act with circumspection and restraint." Tex. Disciplinary R. Prof. Conduct 3.06 cmt. 2. Snooping on venire members in a room where a party has no business being is not circumspection or restraint.

The rules take this conduct so seriously that they also imposed on JSW's co-defendants a duty to report it: "A lawyer shall reveal promptly to the court improper conduct . . . by another

8

toward a venireman or a juror . . . of which the lawyer has knowledge." Tex. Disciplinary R. Prof. Conduct 3.06(f). "Because of the extremely serious nature of any actions that threaten the integrity of the jury system, a lawyer who learns of improper conduct . . . towards a venireman [or] a juror . . . should make a prompt report to the court regarding such conduct." *Id*. 3.06 cmt. 4. Other defense counsel had a duty to promptly report the misconduct after JSW disclosed it to them. *See* Exh. 1; Exh. 2. If not for court personnel, JSW's improper contact with prospective jurors would have remained secret from the Court and MM Steel. Had JSW's lawyer left the room earlier, before court staff questioned her, defendants never would have said a word.

The only way to ensure that defendants do not retain an unfair advantage, and that this case not be tried to a jury tainted by improper *ex parte* contact, is to reboot the jury selection process by seating a new venire panel. The misconduct came to light in time to avoid major disruption, delay, and waste of a mistrial or new trial. A new venire panel can fill out the same questionnaire today, or as soon as possible, and we can start trial the next day. That solution is within the Court's inherent power to manage jury selection. *See United States v. White*, 78 F. Supp. 2d 1025, 1028 (D.S.D. 1999); *Allen v. Snow,* 489 F. Supp. 668, 672 (D. Mass. 1980).

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court order that:

- the current venire panel be dismissed and a new venire panel be seated;

- JSW produce its counsel's notes from observation of the venire panel and any other written communications or later analysis relating to those observations;

- JSW present its counsel for examination into the facts surrounding this misconduct;

- The Court assess against JSW any costs attributable to the need to restart the jury-selection process; and,

- Plaintiff be granted any other relief to which it is justly entitled.

Dated: February 10, 2014                    Respectfully submitted,

Of Counsel**:**                             /s/ *Mo Taherzadeh*_____
                                            Mo Taherzadeh
R. Paul Yetter                              TAHERZADEH LAW FIRM
pyetter@yettercoleman.com                   State Bar No. 24028022
State Bar No. 22154200                      1001 West Loop South, Suite 700
Marc S. Tabolsky                            Houston, Texas 77027
mtabolsky@yettercoleman.com                 Telephone: (713) 360-6055
State Bar No. 24037576                      Facsimile: (713) 626-7113
Bryce L. Callahan                           mo@taherzadehlaw.com
State Bar No. 24055248
YETTER COLEMAN LLP                          Attorney-in-Charge for
909 Fannin, Suite 3600                      Plaintiff MM Steel, LP.
Houston, Texas 77010
Telephone: (713) 632-8000
Facsimile: (713) 632-8002

R. Tate Young
tyoung@tateyounglawfirm.com
TATE YOUNG LAW FIRM
State Bar No. 22207100
1001 West Loop South, Suite 700
Houston, Texas 77027
Telephone: (713) 626-7112
Facsimile: (713) 626-7113

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served on all counsel of record this 10th day of February 2014, in compliance with the Federal Rules of Civil Procedure via the Court's ECF system for filing.

/s/ *Marc S. Tabolsky*\_\_\_\_\_
Marc S. Tabolsky