UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MM STEEL, LP, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | |
| § | |
| RELIANCE STEEL & ALUMINUM CO., § | |
| CHAPEL STEEL CORP., AMERICAN § | CASE NO. 4:12-CV-01227 |
| ALLOY STEEL, INC., ARTHUR J. MOORE, § | |
| JSW STEEL (USA) INC., NUCOR CORP., & § | |
| SSAB ENTERPRISES, LLC D/B/A SSAB § | |
| AMERICAS, § | |
| § | |
| Defendants. § | |

### DEFENDANTS AMERICAN ALLOY STEEL, ARTHUR J. MOORE, RELIANCE STEEL & ALUMINUM CO., AND CHAPEL STEEL CORP.'S BRIEF REGARDING THE RELEVANCE OF CHAPEL'S STATE COURT LAWSUIT

Defendants American Alloy Steel ("American Alloy"), Arthur J. Moore, Reliance Steel & Aluminum Co. ("Reliance"), and Chapel Steel Corp. ("Chapel") (collectively, "Defendants") file this brief in support of Defendants' request that they be permitted during opening statements to refer to Chapel's state court lawsuit against MM Steel and its four initial employees, including the temporary restraining orders ("TROs") entered and the injunction agreed to by the parties to that suit (the "Agreed Injunction").[1]

In its Motion in Limine, Plaintiff requested that the Court bar reference to "The Alleged Merits of Reliance/Chapel's Settled Lawsuit." In its December 16, 2013 Memorandum Opinion and Order [Dkt. 379] (the "Order"), the Court granted the motion, in part, holding that "the Court will allow the parties to elicit testimony regarding the circumstances in which Hume and Schultz

---

[1] We understand that Defendants Nucor Corp. and JSW Steel (USA) Inc. are each filing separate briefs on this topic regarding issues specific to those parties.

1

left Chapel, but will not allow *physical evidence* related to the lawsuit, its underlying claims, or its outcome." (Emphasis added.) Defendants understood the order as precluding only physical evidence and permitting testimony regarding the suit. During an off-the-record conference with the Court on February 14, 2014, the Court indicated that it would not allow any reference to the lawsuit or its settlement, whether or not the reference is based on physical evidence.

As discussed below, the state court lawsuit, the state court's TROs, and the resulting settlement agreement with Agreed Injunction are highly relevant to each of the Defendant's defense of Plaintiff's claims, and Defendants will be prejudiced if they are unable to address these key events in their opening statements. "The purpose of an opening statement is to tell the jury what the case is about and to outline the proof." *U.S. v. Breedlove*, 576 F.2d 57, 60 (5th Cir. 1978). This outline of proof includes "relat[ing] parts of the evidence *and testimony* to the whole. . . ." *U. S. v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, J., concurring) (Emphasis added). If the Defendants are not allowed to reference the state court lawsuit, its TROs, and Agreed Injunction — evidence and events critical to the Defendants' story of "what the case is about" — Plaintiff will be afforded a major advantage from the outset of this trial.

Both during opening statements and at trial, the Defendants' ability to mount a full and fair defense depends on being permitted to reference the state court lawsuit, its TROs, and the Agreed Injunction. A bar on making such references would result in a skewed and one-sided trial in favor of the Plaintiff.

**A. Chapel's state court lawsuit is the context for much of Defendants' MM Steel-related conduct.**

The core of this case involves how various companies reacted to MM Steel's start-up as a distributor after MM Steel's principals breached non-competition agreements, took confidential documents, violated their fiduciary duties in leaving Defendant Chapel to set up MM Steel, and

2

were subsequently "shut down" by a Texas court's TROs and an Agreed Injunction. Plaintiff's trial exhibits and pleadings plainly manifest a trial strategy of using the Defendants' emails, phone calls, and meetings in the days and weeks following the formation of MM Steel to suggest that the Defendants were terrified of competing with MM Steel and conspired to destroy the new competition. But Chapel's primary concern in the days and weeks following the formation of MM Steel was the fact that MM Steel was formed in direct violation of Mr. Hume and Mr. Schultz's fiduciary duties and restrictive agreements, and Chapel promptly brought suit to enforce its rights. Partially due to the lawsuit, others in the industry were made aware of MM Steel's unethical conduct, and some of Plaintiff's key pieces of evidence in this case include references to Chapel's legal efforts against MM Steel that can only be properly understood with reference to the lawsuit. This evidence includes:

***The Defendants' Reaction to the Formation of MM Steel*:** Plaintiff claims that the formation of MM Steel was met with "horror" by its competitors due to the economic competition they would now face from the new venture, thus leading to the alleged boycott. (MM Steel's Omnibus Response to Defendants' Summary Judgment [Dkt. 241] ("MSJ Resp.") at 4). As evidence of this "horror," Plaintiff's Exhibit List contains examples of various Defendants reacting negatively to MM Steel's formation. (*E.g.* PX 159, PX 160, PX 165). Defendants are entitled to show that strong reactions to MM Steel's formation were, in fact, prompted by an industry's reaction to what had obviously been a violation of the duties Mike Hume and Matt Schultz owed Chapel in starting a competing venture while still on Chapel's payroll, and depleting Chapel's inventory and stealing customer records. Chapel's state court suit, the TROs, and the Agreed Injunction played a crucial role in cementing these negative reactions to the way that MM Steel was founded.

3

***Chapel's Efforts to Monitor MM Steel*:**  Plaintiff also seeks to introduce a number of internal Chapel emails from the days immediately after Mr. Hume and Mr. Schultz's departure that show Chapel was monitoring MM Steel's activities and investigating the facts surrounding its formation. (*See, e.g.* PX 200, 219, 250, 258, and 275)  Plaintiff argues that Chapel's actions in monitoring MM Steel were part of the alleged conspiracy and designed to interfere with Plaintiff's contractual and prospective relationships.  Chapel's Restrictive Agreements with Mike Hume and Matt Schultz prevented them from disclosing "confidential information," "solicit[ing] . . . for any purpose in competition with [Chapel], any person or entity who has a customer . . . of Company" for one year, and "solcit[ing] . . . any Employee of [Chapel] to terminate his or her employment with [Chapel]." (DX 12, DX 13).  Chapel should be allowed to show that it monitored MM Steel to confirm that MM Steel was not honoring these agreements and to prepare a lawsuit to prevent MM Steel's further violations of the restrictive agreements.  Chapel should also be allowed to show that, once the state court entered the TROs, and later the Agreed Injunction, Chapel monitored MM Steel to assure compliance with these court orders.

***JSW's Decision to Stop Selling to MM Steel*:**  As purported evidence of conspiracy, Plaintiff cites Defendant JSW's decision to stop selling to MM Steel weeks after JSW's President, Michael Fitch, spoke to Reliance's President Gregg Mollins about JSW's support for the new company.  Mr. Fitch has testified that JSW's decision to stop doing business with MM Steel was actually an independent one based on several key factors, including: (1) the unethical way Hume and Schultz left Chapel; (2) the fact that Mr. Hume and Mr. Schultz had falsely assured JSW that Chapel would have "no issue" with their selling to MM Steel while they were still employed by Chapel; and (3) the logistical problems MM Steel caused JSW when Chapel's state court suit caused MM Steel to issue a stop shipment order to JSW. (Ex. A, Mike Fitch

4

Depo. at 126:10-127:6, 176:10-177:22; DX 232).  Defendants intend to elicit testimony from Mr. Fitch regarding these legitimate bases for ceasing business with MM Steel.  A bar on referencing the state court lawsuit and TROs would prevent Mr. Fitch from fully explaining his rationale and citing to the documents that would support this defense.

*Chapel's Meeting with American Alloy*:  Plaintiff relies heavily on an internal American Alloy email (PX 226) about a September 8, 2011 meeting between Arthur Moore of American Alloy and Stan Altman of Chapel. (Complaint [Dkt. 1] at 3-4, 6-7, 14-15; MSJ Resp. [Dkt. 241] at 1, 5, 17, 52, 54).  Mr. Moore reports that Chapel plans to take action "legally and otherwise" against MM Steel.  Chapel intends to introduce evidence that "legally" refers to the state court lawsuit – which Plaintiff admits in its Complaint (Complaint [Dkt. 1] at 4) – and "otherwise" refers to competing head-to-head in the market.  If Chapel is barred from referring to the lawsuit, the jury may wrongly interpret "legally and otherwise" to be an admission that Chapel intended to take illegal actions.

*Art Moore's Email to Stan Altman*:  Plaintiff has also offered an email in which Art Moore tells Stan Altman that MM Steel has been selling to "some of your customers at a ridiculously low price." (PX 334).  Plaintiff claims this communication was in furtherance of the alleged conspiracy.  Chapel intends to introduce evidence that the only action Mr. Altman took was to put a call into Mr. Moore because Altman wanted to know the names of the customers so that Chapel could determine whether MM Steel was violating the state court's TROs.  Barring Defendants from referencing the state court lawsuit and TROs will prevent Chapel from establishing this highly-relevant defense.

*Reliance's Communications with Mittal*:  Plaintiff bases a claim that non-party AreclorMittal USA, Inc. ("Mittal") was involved in the conspiracy almost entirely on an internal

5

Mittal email from early September of 2011, which says that Reliance's Gregg Mollins had called Mittal's Mike Martin to discuss MM Steel (PX 235). Defendants intend to introduce testimony from Mr. Martin's deposition in which Mr. Martin explains that Mr. Mollins had told him that Mr. Mollins "felt the two individuals were not ethical and they were responding in a nonbusinesslike way, and that [Mr. Mollins] planned to take action in court to stop them from soliciting business from their accounts." (Ex. B, Martin Depo. at 37:23-38:2). If the Defendants are barred from referencing the state court lawsuit, they will be prejudiced in their defense of Plaintiff's claim that Reliance conspired with Mittal.

***"Talk to Whiteman About North Shore & MMS"***:  Plaintiff has also included a reminder Chapel's Matt Tocci sent himself to talk to Nucor's Jeff Whiteman "about North Shore and MMS" as evidence of the alleged conspiracy. (PX 563). Defendants intend to introduce evidence that the purpose of the reminder was for Mr. Tocci to ask Nucor what customers MM Steel may be selling to through North Shore so that Chapel could determine whether MM Steel was violating the state court's Agreed Injunction through North Shore. A bar to referencing the Agreed Injunction would prevent Chapel from defending itself and render the presentation of this email incomplete and misleading.

**B. The state court lawsuit is relevant to Plaintiff's alleged injury.**

Defendants intend to show that MM Steel's only "business plan" was to sell steel plate to the customers MM Steel's principals and employees sold to while they were at Chapel. MM Steel's business plan was to "do the same thing we had always done . . . sell steel plate into this market to our customers." (Ex. C, Hume Depo. at 150:9-11). MM Steel's expert, Dr. Stephen Magee, similarly assumed that MM Steel would sell to "the same customer base as Chapel's Houston office. . . ." (Defendants' Motion to Exclude Testimony and Report of Stephen P.

6

Magee and Memorandum in Support [Dkt. 193] - Ex. A, Magee Report at 24).  Defendants will show that MM Steel's failure to succeed with this business plan had nothing to do with a boycott that deprived it of access to steel; MM Steel always had access to steel that it could sell to those customers.  Rather, MM Steel failed to achieve its business plan because the TROs and the Agreed Injunction restricted MM Steel's ability to sell to most of these customers.  Therefore, the TROs and Agreed Injunction refute Plaintiff's injury claim. Moreover, Plaintiff's damage model ignores the impact of these restrictions on MM Steel's ability to sell steel in accordance with MM Steel's only business plan.[2]

As the Supreme Court stated recently in *Comcast Corp. v. Behrend*, it is an "unremarkable premise" that, if antitrust plaintiffs prevail on their claims, they would be entitled only to damages resulting from the specific violative conduct.  133 S.Ct. 1426, 1433 (2013). While MM Steel claims here that it was shut down by a conspiracy, before this lawsuit was filed MM Steel told customers that the company was "shut down"[3] by the state court lawsuit.  (DX 239 p. 14).  Barring any reference to the TROs and the Agreed Injunction will prevent Defendants from proving that Plaintiff's alleged injury is attributable to a faulty business plan foiled by Court orders, not any alleged conspiracy.

**C. The impact of Chapel's filing its state court suit against MM Steel and obtaining a TRO goes to the core of this case.**

Defendants are cognizant of the Court's concern that direct references to a previous law suit, and the judge's orders therefrom, carry the risk of unduly influencing the jury; however, due

---

[2] Plaintiff's expert Stephen Magee even goes so far as to argue, in a section of his expert report titled, "MM Steel Would Not Have to Overcome the Same Issues as the Starting of the Chapel Houston Office," that MM Steel actually had a better chance of early success than Chapel Houston had in 1999.  Magee does this without making any mention of the state court orders that prevented MM Steel from selling to the vast majority of MM Steel's intended entire customer base.  Defendants must be allowed to cross-examine Dr. Magee on this omission.

[3] To the extent that Plaintiff will argue that the state court suit was a part of the conspiracy and that any damage to MM Steel's profitability from the state court suit should still be considered part of Plaintiff's damages, such an argument would just as certainly make the state court suit relevant.

to the essential part that the state court lawsuit plays in the story of MM Steel, barring the parties from referencing the state court lawsuit and accompanying TROs, both during opening statements and during the presentation of witnesses, would afford Plaintiff an advantage far more significant than any risk of influence and would greatly impact the Defendants' due process right to a fair trial.  Barring Defendants from directly referencing the lawsuit, the TROs, and the Agreed Injunction would prevent the Defendants' from putting on evidence that goes to the core of their defense.

The impact of the state court suit and the TROs on MM Steel cannot be overstated.  Just two weeks after MM Steel officially opened its doors, a series of TROs prevented the company from contacting the vast majority of its intended customer base.  As discussed above, these orders "shut down" MM Steel (as MM Steel itself acknowledged at the time) and forced the company to instruct its supplier, JSW, to stop shipping steel that had already been ordered. (DX 239 p. 14; DX 232, DX 234).  Before MM Steel was even a month old it was "shut down" and putting orders on hold with the only mill from which it had ordered steel plate.  Meanwhile, Chapel Steel and its employees were convinced that Mike Hume and Matt Schultz were trying to destroy Chapel's business and viewed the state court suit as a critical piece in their efforts to save Chapel's Houston branch.

If the impact of the TROs and Agreed Injunction are excluded, the jury cannot possibly be given a true and accurate picture of MM Steel's early struggles and setbacks. Even Plaintiff's Complaint acknowledges that MM Steel needed to settle the state court lawsuit so that it could "go about its business of competing. . . ." (Complaint [Dkt. 1] at 14).  If the Defendants are not allowed to preview this evidence of the harm caused MM Steel by the "shut down" during

8

opening statements, Plaintiff will be afforded a great advantage in presenting a one-sided story of this case to the jury, without the chance for rebuttal.

**D. Plaintiff's exhibits explicitly address the state court suit.**

Despite arguing to the Court that the state court lawsuit and its settlement are irrelevant to the present action, Plaintiff's exhibits include explicit references to the state court suit, the state court's TROs, and the Agreed Injunction. Along with many of the exhibits discussed in Part A, above, Defendants' ability to respond to allegations surrounding these documents accurately and fairly depends entirely on Defendants' ability to reference the state court suit and its resulting orders:

- **PX 371**: Matt Schultz emails JSW's Rajesh Khosla three days after the Agreed Injunction to inform him that the Chapel suit has "concluded." Schultz expresses a desire to "sit down with yourself and Mike and update ya'll with what all has been going on." Plaintiff is affirmatively putting the state court suit's impact on MM Steel's relationship with JSW at issue, and the Defendants must be allowed to respond with their own evidence.
- **PX 561:** A customer emails Mike Hume weeks before the Agreed Injunction was set to expire and comments "[y]our time in the corner should be about over." The Defendants' must be able to explain the meaning of, and legitimate basis for, this "time in the corner" reference or MM Steel can simply suggest that MM Steel suffered an undeserved obstacle.
- **PX 618:** Similarly, Chapel's Greg Nolan mentions the expiration of the Agreed Injunction in an internal Chapel email that discusses competing with MM Steel.
- **PX 86 & 87:** Mike Hume and Matt Schultz's Termination of Employment Agreements with Reliance. Unless the Defendants are allowed to explain why Chapel had a legal basis to sue MM Steel and provide the documentary evidence to support this claim, Plaintiff can use these documents to present a one-sided argument that Mike Hume and Matt Schultz did not have non-compete agreements with Chapel and did not deserve to suffer the six-month bar on contacting customers.

Because Plaintiff is offering evidence referencing these matters, it would be unfair and prejudicial to preclude Defendants from doing so as well.

**E. Plaintiff has also alleged that the state court suit itself is evidence of a conspiracy.**

MM Steel claims here that "Chapel's state court lawsuit and subsequent release were part of an unlawful scheme. . . ." (Reliance/Chapel's State-Law Motion for Summary Judgment [Dkt. 207], Exhibit 22 – MM Steel's Supplemental Response to Reliance and Chapel Interrogatories at # 4).  Plaintiff insists that it has been "explicitly calling the state court law suit a sham" since the inception of this suit.  (Response to Reliance/Chapel's Motion for Leave to Amend [Dkt. 160] at 2).  The merits of the state court lawsuit are thus highly relevant.

## F.  Plaintiff's state-law tort claims put Chapel's lawsuit at issue.

Plaintiff has also put the merits of the state court litigation at issue by bringing business disparagement and tortious interference claims against Chapel and Reliance that can only succeed by proving that Chapel made false statements about the items stolen by Hume and Schultz and that Chapel did not have a legal right to take action against MM Steel.  Plaintiff's business disparagement claim depends on proving that Reliance and Chapel falsely accused MM Steel of acting improperly, a claim that turns entirely on the merit of the state court suit.  Reliance and Chapel have pled the affirmative defense of justification and intend to introduce evidence that the actions that allegedly interfered with MM Steel's business relationships were, in reality, justifiable efforts to protect Chapel's legal rights. *See Wal-Mart Stores v. Struges*, 52 S.W.3d 711, 727 (Tex. 2001).  The merits of the state court lawsuit itself will be central to the jury's determinations of Reliance and Chapel's affirmative defense of justification.

## G.  Reliance and Chapel's waiver defense is based on the Agreed Injunction

Barring reference to the settlement entered in the state suit would also prevent Reliance and Chapel from putting on evidence to support the affirmative defense of waiver.  This defense, specifically pled in Reliance and Chapel's combined Answer, is based on the parties' settlement agreement to the state court lawsuit, wherein MM Steel waived any claim for conduct occurring

prior to October 15, 2011. (Answer [Dkt. 74] at 16). Barring any reference to the state court lawsuit would prevent Reliance and Chapel from admitting into evidence the settlement agreement it would need to establish this affirmative defense.

**H. Plaintiff has also put the state court suit at issue by seeking exemplary damages.**

As a part of its business disparagement and tortious interference claims, Plaintiff has asked for exemplary damages under Texas statute, alleging that Reliance and Chapel acted with malice. (Complaint [Dkt. 1] at 24-25). Reliance and Chapel intend to introduce evidence that their conduct was not motivated by any malice, but rather by a desire to enforce their legal rights under Hume and Schultz's Restrictive Agreements with Chapel and, later, Plaintiff's obligations under the state court's TROs and Agreed Injunction. Barring reference to the state court lawsuit will prevent Reliance and Chapel from putting on this highly relevant defense.

**I. The Defendants can reference the state court suit without implicating any of the concerns raised by the Court.**

In using evidence referencing the conduct underlying Chapel's state court lawsuit or its impact on MM Steel's business, Defendants will not implicate any of the concerns raised by the Court in its Order. The Court's Order listed two concerns regarding the use of evidence from the state court suit: (1) "the jury being overwhelmed by the potentially voluminous evidence of the actions underlying the settled claims" and (2) "discussion of those actions extending beyond the issues for which they are relevant." Defendants will be mindful of these concerns and limit the documentary evidence presented about the state court lawsuit.

The Court also expressed a concern at the Pre-Trial Conference that the jury may lend undue significance to orders from a prior litigation. The Defendants have no intention of using the state court's TROs or the Agreed Injunction to argue that one party or another would have won the state-court lawsuit. It is the *impact* that the state court suit, the TROs, and the Agreed

11

Injunction had on MM Steel and the communications and actions of other Defendants that the Defendants need to reference in order to properly defend this case. The Defendants do not intend to argue that the state court judge made any final ruling on the merits of Chapel's claims or that Chapel prevailed in the suit. Finally, if the Court deems it necessary, the Defendants are confident that a curative instruction against lending undue deference to the state court orders would mitigate any risk of confusion by the jury.

## CONCLUSION

Given the critical relevance of the state court lawsuit to Defendants' full and fair defense, the Defendants ask the court to allow the parties to introduce evidence that directly relates to the merit of Chapel's state court lawsuit and the impact that suit had on MM Steel and to preview this evidence during their opening statements. The Defendants will primarily rely on testimony to present its case, but also ask the court to allow documentary evidence, where necessary to support or impeach testimony on this subject, that is so central to the Defendants' story of this case.

Dated:  February 17, 2014.

Of Counsel:
Jeffrey S. Johnson
State Bar No. 24002368
Federal I.D. No. 22089
Elizabeth M. Devaney
State Bar No. 24040100
Federal I.D. No. 941119
Olivia D. Howe
State Bar No. 24075660
Federal I.D. No. 1305651
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, Texas  77002-6760
Telephone:  (713) 758-2198
Telecopier:  (713) 615-5920

Respectfully submitted,

*/s/ Karl S. Stern*
Karl S. Stern
Attorney-in-Charge
State Bar No. 19175665
Federal I.D. No. 4870
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, Texas  77002-6760
Telephone:  (713) 758-3828
Telecopier:  (713) 615-5603
kstern@velaw.com

**Attorneys for Defendants Reliance Steel & Aluminum Co. and Chapel Steel Corp.**

Of Counsel:
Anne M. Rodgers
State Bar No. 17133025
Federal I.D. No. 12576
William R. Pakalka
State Bar No. 15420800
Federal I.D. No. 1572
Geraldine W. Young
State Bar No. 24084134
Federal I.D. No. 1725980
FULBRIGHT & JAWORSKI LLP
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:  (713) 651-5151
Telecopier:  (713) 651-5246

*/s/ Chris Hanslik*
Chris Hanslik
Attorney-in-Charge
State Bar No. 00793895
Federal I.D. No. 19249
BOYAR MILLER
4265 San Felipe, Suite 1200
Houston, Texas 77027
Telephone:  (713) 850-7766
Telecopier:  (713) 552-1758
chanslik@boyarmiller.com

**Attorneys for Defendants Arthur J. Moore and American Alloy Steel, Inc.**

**CERTIFICATE OF FILING AND SERVICE**

      I hereby certify that on February 17, 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

                                                  /s/ *James L. Leader, Jr.*
                                                  James L. Leader, Jr.