UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | | |
|---|---|---|---|
| MM STEEL, LP, | § | | |
| | § | | |
| Plaintiff, | § | | |
| | § | | |
| v. | § | | |
| | § | | |
| RELIANCE STEEL & ALUMINUM CO., | § | | |
| CHAPEL STEEL CORP., AMERICAN | § | CASE NO. | 4:12-CV-01227 |
| ALLOY STEEL, INC., ARTHUR J. MOORE, | § | | |
| JSW STEEL (USA) INC., NUCOR CORP., & | § | | |
| SSAB ENTERPRISES, LLC D/B/A SSAB | § | | |
| AMERICAS, | § | | |
| | § | | |
| Defendants. | § | | |

**DEFENDANT JSW STEEL (USA) INC.'S JOINDER IN DEFENDANTS' BRIEF
REGARDING THE RELEVANCE OF
CHAPEL STEEL'S STATE-COURT LAWSUIT**

Defendant JSW Steel (USA) Inc. ("JSW") joins in the brief filed by Defendants

American Alloy Steel, Inc., Arthur J. Moore, Reliance Steel & Aluminum Co., and Chapel Steel

Corp. (Dkt. 432) in support of Defendants' request that they be permitted during opening

statements to refer to Chapel's state-court lawsuit (the "Lawsuit") against MM Steel and its four

initial employees, including the temporary restraining orders ("TROs") entered and the

injunction agreed to by the parties to that suit (the "Agreed Injunction").

Plaintiff has made the Lawsuit a central theme throughout its complaint, repeatedly

alleging specific facts (highlighted) as to the Lawsuit and/or the TROs and Agreed Injunction:

15.     The reference in Defendant Moore's email to "legally" refers to a **state
court lawsuit** filed by Chapel against Hume, Schultz, MM Steel, and two other
former employees of Chapel shortly after they started doing business as MM Steel
on September 1, 2011.

16.     In that **lawsuit**, Chapel asserted violations of alleged covenants not to
compete and secured a **temporary restraining order** on September 15, 2011.
Before a temporary injunction was concluded, the parties reached a settlement

1

that included an **agreed permanent injunction** prohibiting MM Steel and the other defendants from soliciting certain Chapel customers until March 15, 2012. Other than that restriction, however, MM Steel, Hume, and Schultz believed they could go on with their business of buying and selling steel. But as Defendant Moore's emails and the other evidence set forth below show, Defendants Reliance/Chapel and American Alloy had other ideas. Indeed, it is now clear to Plaintiff MM Steel, Hume, and Schultz that **the settlement and the agreed permanent injunction in the state court case were a sham and fraudulently induced**, because Defendants did not intend to allow Plaintiff MM Steel to compete as a metals service center.

. . . .

56.     Plaintiff MM Steel started doing business on September 1, 2011, though its operation was brought to a halt on September 15, 2011 when Chapel obtained a **temporary restraining order** against Hume, Schultz, and two of MM Steel's employees based on alleged covenants not to compete. That case was settled, with an **agreed permanent injunction** prohibiting MM Steel and its employees from soliciting a select list of Chapel customers until March 15, 2012, when the **agreed permanent injunction** would terminate.

57.     Setting aside MM Steel's (and Hume's and Schultz's) view of the merits or the motivation behind Chapel's **state court lawsuit**, it was assumed by them that upon the execution of the settlement in the state court action, MM Steel would be able to go about its business of competing with Reliance/Chapel, American Alloy, and other competitors. MM Steel's assumption was based on the terms of the **agreed permanent injunction**, which only prohibited the solicitation of a select group of Chapel's customers. However, Plaintiff MM Steel was wrong in its assumption because Defendants here had other ideas. Indeed, MM Steel now knows **the settlement and the injunction were a sham and fraudulently induced**, because the other side never had any intention of allowing MM Steel to compete, even subject to an injunction.

. . . .

61.     Evidently, Reliance/Chapel and American Alloy were not satisfied with the settlement (the **injunction**) in the state court action and the toll it took on MM Steel, leaving only Hume and Schultz to sell steel. Not long after the ink had dried on the settlement and the **agreed permanent injunction**, a concerted campaign by the Defendants to squash a competitor commenced.

62.     None of this was known to Plaintiff MM Steel, so it naturally resumed doing business, albeit subject to an **agreed permanent injunction**. In mid-October 2011, MM Steel attempted to purchase additional steel from JSW. JSW and Plaintiff MM Steel had entered into a one-year agreement in August 2011. Among other terms, that agreement required "MM Steel . . . to attempt to buy, or

caused to be bought [from JSW], a minimum of 500 tons per month average at a price agreed upon by both parties."  In turn, JSW agreed "to supply this quantity as per the MM Steel's requirements and material specification guidelines . . . ." JSW had already sold steel to MM Steel under their agreement.

. . . .

80.     Despite repeated attempts, Whiteman was not returning Cooper's calls. Before Cooper and Whiteman eventually talked, however, Cooper had another discussion with Vinson on Monday, March 19, 2012.  Vinson called Cooper and again raised the issue of Plaintiff MM Steel and mentioned a meeting at Nucor about MM Steel.  Vinson also specifically referenced the **agreed permanent injunction** between Chapel and MM Steel, Hume, and Schultz, and the fact that it had terminated on March 15, allowing Plaintiff MM Steel to compete without any restrictions.  The **injunction** had nothing to do with Nucor.  Cooper told Vinson he needed to discuss the issue further with Whiteman.

81.     Later that morning, Cooper finally got a hold of Whiteman. Whiteman was very careful in his choice of words, but he made it clear that "all eyes were on" MM Steel. Whiteman mentioned "Mittal, JSW, Nucor, Reliance, Chapel . . . American Alloy, and Ranger" as "monitoring" Plaintiff MM Steel. He further stated that "the powers that be at Nucor would not sell steel" to MM Steel. Whiteman was very clear in stating that should North Shore continue doing any business with MM Steel, even simply employing Hume and Schultz, Nucor would stop selling it steel. According to Whiteman, MM Steel was on everyone's radar and being watched closely, and that no mill would support MM Steel or anyone who did business with it. Whiteman also said that although he had no problem with Hume and Schultz, he was given a "mandate" from his higher ups at Nucor to not support Plaintiff MM Steel because of Reliance, Nucor's biggest customer. Furthermore, Whiteman told Cooper that Reliance/Chapel, American Alloy, and Ranger Steel are "terrified" that Plaintiff MM Steel will take business away from them. Like Vinson, Whiteman also brought up March 15 as having been the last day of the **agreed permanent injunction**. In that context, Whiteman said that Reliance/Chapel, American Alloy, and Ranger Steel could not stop MM Steel from going after that business, but they (Defendants) could cut off Plaintiff MM Steel's supply of steel.

Plaintiff alleges that these facts as to the Lawsuit, TROs, and Agreed Injunction support

its claims of antitrust conspiracy, tortious interference with the JSW/MM agreement, and tortious

interference with prospective agreements with other suppliers.

Defendant JSW also relies heavily on the occurrence of the Lawsuit and/or TROs and

Agreed Injunction in the defenses it has pled.  Plaintiff's principals had misrepresented to JSW

that "there will be no issue, no problem" with them leaving Chapel.  (Ex. A, Fitch Dep. 117:5–

12; 115:24–116:4).   When the Lawsuit, TROs and Agreed Injunction erupted, this brought to

light the seriousness of Plaintiff's principals' misrepresentations – "then subsequently becoming

quite an issue with their leaving Chapel to the point of legal issues and their failure to fully tell

us about that." *Id.* at 223:07–14.  In its Answer, JSW raises numerous defenses on this point.

> . . . .

> 5. MM Steel's claims are barred in whole or in part because of MM Steel's knowing
> or negligent misrepresentations and omissions to disclose.

> 6. MM Steel's claims are barred in whole or in part because of JSW's unilateral
> mistake of fact.

> 7. MM Steel's claims are barred in whole or in part because MM Steel was legally
> restricted in operating its business.

> . . . .

> 10. MM Steel's claims are barred in whole or in part because JSW's actions were
> privileged, justified and/or excused.

> . . . .

> 13. MM Steel's claims are barred in whole or in part by the doctrine of estoppel.

> 14. MM Steel's claims are barred in whole or in part by the doctrine of unclean hands.

The seriousness of Plaintiff's principals' misrepresentations was made even worse by the

fact that the Lawsuit specifically mentioned JSW and both the TRO and Agreed Injunction

extended to "those persons in active concert or participation with them who receive notice of this

Agreed Permanent Injunction and Final Judgment."  MM apparently used steel plate it acquired

from JSW to breach the non-competition covenants MM's principals had with Chapel.

The risky position into which Plaintiff's principals' misrepresentations and fraudulent

inducement placed JSW also raise a significant factual issue as to conspiracy.  Plaintiff alleges

that JSW as a supplier was involved in a boycott conspiracy with customers.  The Fifth Circuit in *Viazis v. American Ass'n of Orthodontists,* requires a plaintiff to show that a supplier's alleged decision to cease dealing with a disfavored customer lacked business justification.  *Viazis*, 314 F.3d 758, 763–64 (5th Cir. 2002).  "[Plaintiff] Viazis needed to show both that the [horizontal competitors] AAO threatened a boycott and that [supplier] GAC's decision to cease marketing the Viazis bracket was inconsistent with its independent self-interest."  *Id.* at 763.  JSW's acting to reduce its legal risk, impaired reputation, and possibility of further business interruptions due to TROs and injunctions is clearly a legitimate justification under *Viazis* to cease dealing with a customer which has been found by a court to have violated non-competition covenants using the supplier's own steel.

In addition, the occurrence of the Lawsuit, TROs and Agreed Injunction also undermines Plaintiff's causation and damage proof.  Plaintiff for six months was legally curtailed in its business, and the Lawsuit, TROs and Agreed Injunction would be factors for customers to consider in deciding about future involvement with Plaintiff.

## CONCLUSION

In light of the pervasive presence of the Lawsuit, TROs and Agreed Injunction in the claims being asserted by Plaintiff, in the defenses being raised by Defendants, and in the evidence, exclusion of evidence as to the Lawsuit, TROs, and Agreed Injunction would prejudice JSW in trying its case.  Allowing Plaintiff to proceed using only partial versions of conversations would also prejudice JSW by presenting an incomplete picture to the jury of what happened.  JSW requests that the Court allow the introduction of evidence as to the Lawsuit, TROs, and Agreed Injunction and the inclusion of those matters in opening statements to the jury.

Dated:  February 17, 2014

    Gregory S.C. Huffman
    State Bar No. 10191500
    Federal I.D. No. 9889
    gregory.huffman@tklaw.com
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas  75201
Telephone:  (214) 969-1700
Telecopier:  (214) 969-1751

Respectfully submitted,

By:  */s/ Hunter M. Barrow*
    Hunter M. Barrow
    Attorney-in-Charge
    State Bar No. 24025240
    Federal Bar No. 25828
    hunter.barrow@tklaw.com
    Wade A. Johnson
    State Bar No. 24062197
    Federal I.D. No. 1055556
    wade.johnson@tklaw.com
    Emily W. Miller
    State Bar No. 24079527
    Federal Bar No. 1366940
    emily.miller@tklaw.com
THOMPSON & KNIGHT LLP
333 Clay Street, Suite 3300
Houston, Texas  77002
Telephone:  (713) 951-5838
Telecopier:  (713) 654-1871

**Attorneys for Defendant JSW Steel (USA) Inc.**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on February 17, 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

/s/ *Hunter M. Barrow*
Hunter M. Barrow