# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

### No. 14-20267

United States Court of Appeals
Fifth Circuit

**FILED**

November 25, 2015

Lyle W. Cayce
Clerk

MM STEEL, L.P.,

      Plaintiff - Appellee

v.

JSW STEEL (USA) INCORPORATED; NUCOR CORPORATION,

      Defendants - Appellants

United States District Court
Southern District of Texas
FILED

MAR 2 1 2016

David J. Bradley, Clerk of Court

Appeals from the United States District Court
for the Southern District of Texas

Before BENAVIDES, CLEMENT, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This case concerns the Gulf Coast domestic steel industry. In 2011, two longtime steel industry salesmen opened a new steel distributor, MM Steel, L.P. ("MM"). MM quickly found it difficult to survive because certain steel manufacturers, including Nucor Corporation ("Nucor") and JSW Steel (USA), Inc. ("JSW"), refused to sell them steel. Shortly before MM closed, MM sued the manufacturers and MM's competing distributors, claiming that the distributors formed an illegal conspiracy to deprive MM of steel and that the manufacturers knowingly joined the conspiracy. After a six-week trial, a jury found the defendants per se liable under Section 1 of the Sherman Act, 15 U.S.C. § 1. The district court trebled the damages to more than $150 million.

No. 14-20267

The defendants timely appealed, but the distributors and one manufacturer settled and dismissed their appeals, leaving JSW and Nucor as the only appellants. Finding, *inter alia*, insubstantial evidence that Nucor joined this conspiracy, we REVERSE the judgment as to Nucor, but we AFFIRM the judgment as to JSW.

## BACKGROUND

### I.

In the Gulf Coast domestic steel industry, steel manufacturers sell approximately half of their steel plate to end users, including companies such as Wal-Mart, Exxon, and General Motors, and sell the other half to distributors who then sell the plate to end users. To be profitable, the distributors rely on their supply agreements with the manufacturers. Plaintiff MM is a distribution company that was founded by two steel distributor salesmen—Matt Schultz and Mike Hume. Defendants Nucor and JSW are two major steel manufacturers in the Gulf Coast region.

The record supports the following facts. Schultz and Hume worked together as salesmen at American Alloy ("AmAlloy"), a steel distributor, until they left in 1999 to open an office in Houston for another distributor, Chapel. In spring 2011, Schultz and Hume began planning to leave Chapel to open their own distribution company, MM. As part of their preparation, they met with JSW, from whom they had purchased steel at Chapel. On August 2, 2011, MM and JSW signed a one-year supply agreement for MM to purchase a certain amount of steel plate per month from JSW. MM received a $750,000 line of credit from Wells Fargo, and JSW agreed to extend an additional line of credit for double that amount. On September 1, without providing notice, Schultz, Hume, and two other top Chapel salesmen resigned from Chapel, and officially opened MM.

2

No. 14-20267

Chapel and AmAlloy were not pleased that Schultz and Hume had left to open MM. On September 3, AmAlloy executives discussed "do[ing] all we can to help [Chapel] in going after [MM]." Chapel's president, Stan Altman, was overheard telling a Chapel salesman "[i]f you don't have any steel, you can't sell any steel." On September 8, Altman met with Arthur Moore, AmAlloy's president, and upon leaving the meeting, Moore said "[d]on't worry, we're going to get them." Chapel informed Moore that Chapel "plan[s] on taking all available courses of actions, legally and otherwise, including notifying any mill that is selling [to MM], that they can no longer expect any future business from Chapel." As described in more detail below, Chapel and AmAlloy went forward with plans to threaten manufacturers to not sell steel to MM.

## II.

On September 15, 2011, Chapel filed a lawsuit against MM and its founders alleging that MM had violated a non-compete agreement. The next day, MM told JSW to hold off on shipments until further notice. On September 20, MM met with JSW. MM informed JSW that the lawsuit prompted their request to stop shipments and raised the possibility of having to return some steel that JSW had manufactured for MM. The day before the meeting between MM and JSW, JSW executives met with AmAlloy's Moore, at Moore's invitation. Moore told JSW's representatives that JSW had a choice to make: "The choice was to do business with American Alloy or to do business with MM Steel." Later, on September 29, Moore emailed Chapel's Altman about JSW's "ridiculously low" sales prices to MM and said he hoped Chapel would be successful in shutting MM down. On October 4, Chapel and JSW met, and Chapel gave JSW a choice to do business with Chapel or with MM.

Around October 14, Chapel and MM settled the lawsuit over the non-compete agreement. The settlement prohibited MM from contacting and

3

No. 14-20267

selling to certain customers for six months. MM then told JSW the lawsuit had been resolved and asked for a quote. On October 20, JSW's president, Mike Fitch, told MM that it would not be doing business with MM going forward and that it "understood the gravity of the situation." The day before JSW told MM it was ending their relationship, JSW emailed Chapel wanting to see "if JSW and Chapel Steel could step up business for [Chapel's] Houston [office] and other locations." Chapel then internally commented on the "[i]nteresting timing" of JSW's approach to "step up business."

III.

Nucor and Chapel's relationship dates back to 2000. Nucor supplies seventy-five percent of Chapel's steel, and Chapel is Nucor's largest external customer. On September 1, 2011, Hume left Nucor's Jeff Whiteman a voicemail saying that Hume had left Chapel to start MM and that MM hoped to sell Nucor steel to a longtime Chapel customer. In response, Whiteman immediately emailed Chapel's president to pledge his "fulles support." Following that email, Chapel executives informed Nucor that MM had partnered with JSW, and Nucor reiterated its support of Chapel by instructing its employees that Nucor would not be quoting MM but "will continue to support our existing customers." Around September 2, MM's Hume reached out to three separate Nucor employees, including Nucor's President Whiteman, and each employee declined to quote or discuss a potential sale with Hume.

The jury received evidence, which Nucor contests as inadmissible, alluding to a threat allegedly made by Chapel to Nucor before September 5. On September 5, John Sergovic, the president of ArcelorMittal USA, another steel manufacturer not included in this lawsuit, sent an internal email stating that he had been threatened by Chapel's Altman to not sell to MM and that "Stan [Altman] said he made the same comment to Jeff Whiteman at Nucor."

4

No. 14-20267

In early October, Nucor employees dined with Chapel employees in connection with a retirement party. Nucor denies that MM was discussed at this dinner. On October 26, MM asked Nucor for a quote, and Nucor did not respond. Later, on January 5, 2012, after Nucor got a quote request from a similarly named "M and M Steel," Nucor emailed Chapel asking, "Are these our boys?" Chapel responded, "No our boys are MM Steel but I appreciate you keeping an eye out for them."

After JSW decided to stop supplying MM, MM began buying steel from North Shore, another distributor and customer of Nucor. North Shore began placing orders on MM's behalf from Nucor. Nucor was not happy to learn about this arrangement because it allowed MM to circumvent Nucor's "practice" of not accepting business that conflicts with the business of a current client in order to "stick with [the original] supply chain"—what Nucor referred to as its incumbency practice. Nucor told North Shore it would be a problem to ship steel to MM, and North Shore stopped ordering steel for delivery to MM. On March 19, 2012, Hume and Schultz secretly taped North Shore's Byron Cooper telling them that Nucor's Whiteman told Cooper that "there's a lot of pressure on the mills to not support [MM] from their biggest customers" and also that Whiteman stated "[t]here's a mandate at Nucor that's against supporting [] MM Steel."

MM closed and officially stopped doing business in August 2013.

## IV.

On April 29, 2012, MM sued Nucor, JSW, Chapel, Reliance, AmAlloy, AmAlloy's Moore, and SSAB (an additional manufacturer) in federal court alleging, *inter alia*, an illegal group boycott in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. MM also brought a claim against JSW for breach of contract. The district court denied defendants' motions to dismiss and motions for summary judgment. SSAB settled before trial for $2.5 million. The remaining

5

No. 14-20267

defendants proceeded to trial. MM's sole theory of liability was that defendants were per se liable for joining a horizontal group boycott. As illustrated in the jury's answer to Interrogatory Number 1, the jury found that the distributors "conspire[d] to persuade, induce, or coerce any steel mill not to sell steel plate to MM." Under Interrogatory Number 3, the jury found that Nucor and JSW both "*knowingly* join[ed] the conspiracy" (emphasis added). This finding resulted in a per se violation of § 1 of the Sherman Act and an award of $52 million.[1]  The jury also found JSW liable for breaching its agreement to supply MM and awarded damages of $2 million for this breach. The district court denied various motions for judgment as a matter of law and for new trials. MM elected to recover on its antitrust claims, foreclosing recovery on its contract claim, and the district court trebled the damages, entering a final judgment holding all defendants jointly and severally liable.

Defendants timely appealed, but the distributor defendants (Reliance, Chapel, AmAlloy, and Moore) settled for undisclosed terms and dismissed their appeals. Nucor and JSW are the remaining defendants on appeal. Nucor and JSW appeal the antitrust liability finding and award of damages. In the alternative, JSW also appeals the breach of contract award. Nucor also appeals the district court's denial of its motions for a new trial due to the court's exclusion of expert testimony, flawed jury instructions, the admittance of inadmissible hearsay, and MM's improper closing arguments. JSW appeals the district court's denial of its motion for a new trial due to the admission of MM's "patently unreliable" damages expert. Because we affirm the antitrust judgment as to JSW and reverse the judgment as to Nucor, we will not address

---

[1] Interrogatory Number 4 asked, "Did one or more steel mills refuse to sell steel plate to MM Steel as a result of the conspiracy thereby denying it access to a supply of steel plate necessary for it to compete effectively?" Although the jury answered in the affirmative, because this question did not specifically ask the jury to consider each manufacturer separately (as Interrogatory Number 3 did), clarity is lacking.

6

No. 14-20267

Nucor's evidentiary claims, nor will we address JSW's appeal of the breach of contract award.

## DISCUSSION

### I.

We first consider whether there was substantial evidence to conclude that Nucor and JSW entered into a horizontal conspiracy with the distributors to refuse to deal with MM. We review jury verdicts deferentially. *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013). We review the denial of a judgment as a matter of law *de novo*, but we apply the district court's standard: granting judgment as a matter of law only if the "facts and inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" *Id.* (citation omitted). We can reverse a denial of a motion for judgment as a matter of law only if "the jury's factual findings are not supported by substantial evidence or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 486–87 (5th Cir. 2004). Substantial evidence is something more than "a scintilla of evidence." *Hunnicutt v. Wright*, 986 F.2d 119, 122 (5th Cir. 1993).

To establish liability under § 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must show that the defendants "(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001). MM's sole theory of liability for the manufacturers is that Nucor and JSW joined a horizontal (i.e., between competitors) conspiracy between AmAlloy and Chapel, as explicitly found by the jury in Interrogatories Numbers 1 and 3. Nucor and JSW do not challenge the jury's finding that a horizontal conspiracy existed between the distributors, but rather, they argue that there was not substantial evidence for the jury to conclude that they *joined* the conspiracy. After a

7

No. 14-20267

searching review of the record that exceeds 30,000 pages, we hold that there was not substantial evidence to conclude that Nucor joined the alleged conspiracy, but we affirm the finding as to JSW.

Only a concerted refusal to deal is illegal; a manufacturer "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). So that liability is not levied for independent refusals to deal, a plaintiff seeking to prove that a defendant joined an antitrust conspiracy without direct evidence of the conspiracy must present evidence "that tends to exclude the possibility" of independent conduct. *Id.* at 764; *see Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 545 (8th Cir. 2015) ("Under the 'Colgate doctrine,' '[a] manufacturer . . . generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.' " (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 988 (5th Cir. 1983) ("An antitrust conspiracy is rarely shown by direct evidence, and usually is proved by inference and suspicion." (citing *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948))). Circumstantial evidence of a refusal to deal will not tend to exclude independent conduct unless refusing to deal is "inconsistent with [the manufacturer's] independent self-interest." *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763 (5th Cir. 2002). The jury was properly instructed that a single firm's refusal to deal does not entail a conspiracy if it makes that decision independently.

A plaintiff seeking to prove that a defendant joined a conspiracy must also provide evidence that the conspiring parties "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764 (citation omitted). MM must have provided evidence showing Nucor and JSW knew "the essential nature and general scope" of the joint plan.

8

No. 14-20267

*H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 245 (5th Cir. 1978) (citation omitted). However, MM did not need to prove that Nucor and JSW orchestrated the plan. Rather, parties who knowingly join an antitrust conspiracy, like any conspiracy, are liable to the same extent as other conspirators. *See United States v. All Star Indus.*, 962 F.2d 465, 478 (5th Cir. 1992) ("It is well-established that, as a participant in [a bid-rigging] conspiracy, MIA is legally liable for all the acts of its co-conspirators in furtherance of this crime."); *Spectators' Commc'n Network*, 253 F.3d at 220-21. The jury was also properly instructed that "[w]hat the evidence must show is that . . . each defendant knowingly became a member of the conspiracy."

The type of conspiracy that MM alleged and that the jury found Nucor and JSW to have joined is a group boycott—here, and often, a concerted agreement among competitors to refuse to deal with a manufacturer unless the manufacturer refuses to deal with an additional (typically new) competitor. *See Spectators' Commc'n Network*, 253 F.3d at 221. MM's sole theory of antitrust liability was that Nucor and JSW joined the group boycott by joining the horizontal conspiracy among the competitors, the distributors. For us to affirm liability, a reasonable jury must have been able to conclude that Nucor and JSW knowingly joined the conspiracy between the distributors to refuse to deal with MM. Specifically, MM must have presented substantial evidence tending to exclude the possibility that JSW and Nucor each acted independent of the distributors' horizontal conspiracy. *See Viazis*, 314 F.3d at 762.

A.

JSW contends that there was not substantial evidence to conclude that JSW knowingly joined the horizontal conspiracy between the distributors. We disagree. We first summarize the evidence presented to the jury. JSW originally agreed in writing to do substantial business with MM. JSW even extended a line of credit to the newly formed company. However, after meeting

9

No. 14-20267

with executives from both AmAlloy and Chapel, and receiving independent threats from two distributors, JSW decided to no longer do business with MM. When ending their relationship, JSW told MM that it understood the "gravity of the circumstance." The day before JSW ended its relationship with MM, JSW contacted Chapel to expand their business with Chapel, including its Houston office.

Although evidence of mere complaints from a distributor to a manufacturer would not be sufficient evidence to establish a conspiracy or that a manufacturer joined a conspiracy, *see Viazis*, 314 F.3d at 763, evidence that a manufacturer responded to a distributors' actual *threat* can show concerted action that is not independent conduct. *Id.* at 763–64; *see Monsanto*, 465 U.S. at 767–68 (holding that evidence of specific threats to refuse to deal was probative of concerted action). JSW received actual threats in the form of ultimatums to refuse to deal with MM from AmAlloy and Chapel, both of whom had already formed a horizontal conspiracy.[2] The fact that both companies made these threats within several weeks of each other was sufficient evidence for a reasonable juror to conclude that JSW was aware of the horizontal conspiracy to exclude MM from the market. A reasonable juror also could have concluded that JSW's abrupt decision to no longer deal with MM following these threats and JSW's statements regarding that decision tended to exclude the possibility of conduct that was independent of the distributors' conspiracy.

JSW contends that it made an independent decision to no longer deal with MM after learning of Chapel's lawsuit against MM and after MM asked JSW to postpone shipments. A reasonable juror could have concluded that

---

[2] AmAlloy threatened JSW on September 19, 2011, and Chapel threatened JSW on October 4. The horizontal conspiracy and group boycott between these distributors was confected at the meeting between AmAlloy and JSW on September 8, 2011; as described in MM's brief to this court, "the first business between the companies since Matt and Mike left AmAlloy in 1999, [signaling] a wholesale change in their relationship."

10

No. 14-20267

these reasons were pretextual and that instead, JSW's refusal to deal was a response to the two threats from the distributors. *See Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 478 (3d Cir. 1998) (holding that pretextual excuses to explain a refusal to deal can be circumstantial evidence of a conspiracy); *DeLong Equip. Co. v. Washington Mills Electro Minerals Corp.*, 990 F.2d 1186, 1195–96 (11th Cir. 1993) (same). At the time JSW ended its relationship with MM, Chapel and AmAlloy had already threatened JSW, and MM had already settled the lawsuit with Chapel. In addition, JSW risked a breach of contract claim by ending this relationship. A reasonable juror could have concluded that JSW's explanation for its supposedly independent refusal to deal was pretextual. Because there was substantial evidence that tended to exclude the possibility that JSW acted independent of the horizontal conspiracy between the distributors when it refused to deal with JSW, we affirm the jury's finding that JSW joined the horizontal conspiracy between the distributors. *See Monsanto Co.*, 465 U.S. at 761.

## B.

Nucor also argues that there was not substantial evidence to conclude that it joined the horizontal conspiracy between the distributors. We agree. For us to affirm the finding that Nucor joined the horizontal conspiracy, a reasonable juror must have been able to conclude from the evidence that Nucor knew "the essential nature and general scope" of the joint plan and joined it. *See H & B Equip. Co.*, 577 F.2d at 245. MM needed to provide substantial evidence that tended to exclude the possibility that Nucor's three refusals to deal (September 2, 2011, October 26, 2011, and March 2012) with MM were made independent of the existing horizontal conspiracy between the distributors. *See Viazis*, 314 F.3d at 762. After our searching review of the record, we conclude that MM did not provide such evidence.

11

On September 1, 2011, Nucor was first approached by MM's Hume, who let Nucor know that he had left Chapel and started MM. Nucor's President Whiteman immediately emailed Chapel's Altman to let him know that they were aware of this development and would continue supporting Chapel.[3] Nucor then first refused to quote MM on September 2, 2011. On September 5, 2011, John Sergovic, the president of ArcelorMittal, sent an internal email, which Nucor contests on appeal, stating that Nucor was threatened by Chapel to not deal with MM before that date. Although Nucor's initial email of support to Chapel does not reference this threat or suggest knowledge of this threat, a reasonable juror could have credited Sergovic's email as evidence that Nucor received a threat from Chapel to not deal with MM before committing to its own decision to refuse to deal with MM.[4]

Nucor asserts that each time it refused to deal with MM, it was acting in accordance with its "incumbency practice," where Nucor remains loyal to established customers, such as Chapel, in order to maintain its original supply chain. Even if the jury did not credit this practice, MM did not provide evidence showing that when Nucor first refused to quote MM, Nucor was aware of an agreement between the distributors to foreclose MM from the market. MM failed to provide evidence that tended to exclude the possibility that Nucor acted independent of such a conspiracy. In fact, at the time Nucor first refused to quote MM, Nucor believed that JSW, its competitor, was supplying MM. Hence Nucor would not have perceived that its refusal to deal (a decision either

---

[3] Earlier that day, a Chapel representative visited Nucor with another customer, and according to Nucor's Whiteman, the representative was busy with phone calls due to a development at Chapel's Houston office. That interaction led Whiteman to refer to MM's formation as "the crisis" in his email to Altman. MM did not present any evidence showing that the Chapel representative discussed MM during the visit on September 1.

[4] Notably, the cross-examination of JSW's President Fitch elicited knowledge of raw threats from both Chapel and AmAlloy. The cross-examination of Nucor's President Whiteman did not reveal any knowledge of the alleged threat from Chapel.

No. 14-20267

made independently or even with Chapel) would help foreclose MM from the market. In addition, as MM contends, the horizontal agreement between the two distributors was not confected until September 8, 2012, the first date that AmAlloy and Chapel met following the establishment of MM.[5] Nucor's decision not to deal with MM took place on September 2, 2012, without knowledge of a horizontal conspiracy between Chapel and AmAlloy, and without knowledge of a concerted purpose to rid MM from the market.

Although Nucor's decision to not deal with MM was consistent with the purpose of the group boycott, Nucor's decision does not tend to exclude the possibility that it was made independent of the group boycott. The Supreme Court has held that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). The evidence establishes only that Nucor's decision to support Chapel and not deal with MM was either consistent with its incumbency practice, or at most, consistent with a vertical agreement with Chapel, its longstanding customer. Without knowing that another distributor was threatening manufacturers, or that other manufacturers were refusing to deal with MM, Nucor could not consciously commit to a common scheme to foreclose MM from the market. *See Monsanto*, 465 U.S. at 764. A reasonable juror could not have found that Nucor's original September 2 decision to not deal with MM, made in favor of a longstanding customer, tended to exclude conduct independent of the horizontal conspiracy between the distributors.[6]

─────────────────

[5] MM did not present any evidence showing that Chapel and AmAlloy communicated regarding MM before this meeting.

[6] Again, MM's sole theory of liability was that Nucor joined the horizontal conspiracy and was thus per se liable for antitrust violations. We do not address whether this evidence would be sufficient to establish that Nucor and Chapel entered into a vertical refusal to deal agreement that could be held unlawful under the rule of reason. *See NYNEX Corp. v. Discon*,

13

No. 14-20267

MM has not identified any record evidence showing that Nucor was approached by any distributor other than Chapel seeking concerted action against MM. In fact, the only evidence that could lead a reasonable juror to conclude that Nucor became aware of an *agreement* between the distributors was the statement made by North Shore's Cooper to Hume and Schultz that MM recorded on March 19, 2012. Cooper stated that Nucor's President Whiteman told Cooper, "So there's a lot of pressure on the mills to not support you from their biggest customers." Before Cooper made this statement, Nucor had refused to do business with North Shore when North Shore sold its steel to MM. Even if a reasonable juror could infer that when Nucor refused to deal with North Shore when selling to MM, Nucor was aware of the agreement between the distributors, Whiteman's statement does not tend to exclude the possibility that Nucor acted independent of the horizontal conspiracy between the distributors. Nucor's decision to not do business with North Shore when North Shore was selling to MM was consistent with its original decision not to deal with MM, which was made on September 2, 2011, without knowledge of the conspiracy between the distributors. *See also Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 494 (5th Cir. 1982) (recognizing this court's consistent enforcement of the rule that "inference of a conspiracy is always unreasonable when it is based solely on parallel behavior that can be explained as the result of the independent business judgment of the defendants"). We hold that MM did not present substantial evidence from which a reasonable juror could conclude that Nucor's unwavering refusal to deal with MM in favor of its longstanding relationship with Chapel tended to exclude the possibility

---

*Inc.*, 525 U.S. 128, 136 (1998); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010) ("While pleading exclusively per se violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy. If the court determines that the restraint at issue is sufficiently different from the per se archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed.").

No. 14-20267

that Nucor's actions were made independent of the horizontal conspiracy between AmAlloy and Chapel and joined by JSW. For that reason, we reverse the judgment as to Nucor.

## II.

We next consider whether the district court erred in instructing the jury that if it found that Nucor and JSW joined the conspiracy between the distributors, Nucor and JSW would be per se liable under § 1 of the Sherman Act. The decision to analyze the conspiracy under a per se theory of liability is a question of law that we review de novo. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8th Cir. 2004). Having reversed the verdict as to Nucor, we address only JSW's arguments. JSW argues (1) that the per se rule does not apply and (2) in the alternative, "the case should be remanded for a new trial because the district court failed to properly submit the *Tunica* factors to the jury."

## A.

Whether a restraint on trade is per se illegal or is analyzed under the rule of reason is a key distinction in antitrust law. Although § 1 proscribes "[e]very contract, combination . . . , or conspiracy . . . in restraint of trade or commerce," 15 U.S.C. § 1, it is well-established that only unreasonable restraints on trade actually violate the Sherman Act. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998). To determine whether a restraint is unreasonable, courts use one of two methods of analysis. Most agreements are analyzed under the rule of reason, whereby a court "must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). But, certain agreements "because of their pernicious effect on

15

No. 14-20267

competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *United States v. Gen. Motors Corp.*, 384 U.S. 127, 146 (1966) (citation omitted).   Group boycotts to foreclose an entrant from the market are of this latter character. *Id.*

The Supreme Court has consistently held that the per se rule is applicable to group boycotts identical to the boycott alleged in this case. *See NYNEX*, 525 U.S. at 135.   The Supreme Court has regularly applied per se liability to agreements described as "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (citation omitted).[7]   The Court enforces the per se rule to these group boycotts because "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." *Id.*   In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, the Court found it per se unlawful for manufacturers, distributors, and a retailer to agree to refuse to deal with another competing retailer. 359 U.S. 207, 209–10 (1959).   In *United States v. General Motors Corp.*, the Court held it per se unlawful for an automobile manufacturer to agree with automobile dealers to boycott other dealers that were discounting cars. 384 U.S. at 145. These cases, and many more, illustrate that group boycotts involving a horizontal conspiracy to foreclose a market participant are considered per se violations of § 1. *See Gen. Motors Corp.*, 384 U.S. at 146.

---

[7] That a group boycott organized by a cooperative or professional organization is analyzed under the rule of reason unless the plaintiff can show that the cooperative or professional organization possessed "market power or exclusive access to an element essential to effective competition" has no bearing on this case as it does not involve a cooperative or a professional organization. *See Nw. Wholesale*, 472 U.S. at 296; *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458–59 (1986).

16

No. 14-20267

JSW contends that the Supreme Court limited the application of per se liability to group boycotts in *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007). In antitrust law, a distinction exists between agreements that are made between competitors (horizontal agreements) and agreements between manufacturers and customers (vertical agreements). In *Leegin*, the Supreme Court held that the per se rule is inapplicable to price-setting vertical agreements, adding in dicta that this holding would extend to vertical agreements that facilitate horizontal conspiracies to increase prices. *Id.* ("To the extent a vertical agreement *setting minimum resale prices* is entered upon to facilitate [horizontal cartels that decrease output or reduce competition to increase prices], it, too, would need to be held unlawful under the rule of reason." (emphasis added)).

Long before *Leegin*, settled Supreme Court case law held that purely vertical agreements to refuse to deal are not per se unlawful. *NYNEX*, 525 U.S. at 135. Purely vertical refusals to deal, often referred to as exclusive dealing agreements, frequently have procompetitive justifications, such as limiting free riding and increasing specialization. *See* Richard Posner, *Antitrust Law* 253 (2d ed. 2001). However, the crux of the group boycotts at issue in the cases in which per se liability has always applied is that members of a horizontal conspiracy use vertical agreements anticompetitively to foreclose a competitor from the market. *See NYNEX*, 525 U.S. at 135 ("The agreement in *Fashion Originators' Guild* involved what may be called a group boycott in the strongest sense: A group of competitors threatened to withhold business from third parties unless those third parties would help them injure their directly competing rivals." (describing *Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*, 312 U.S. 457, 461–63 (1941)); *Klor's, Inc.*, 359 U.S. at 208–09. In these cases, the vertical participants, the manufacturers, actually join the horizontal conspiracy. *See United States v. MMR Corp. (LA)*, 907 F.2d

17

No. 14-20267

489, 498 (5th Cir. 1990) (holding that a non-competitor participant in a horizontal conspiracy was per se liable because "[i]f there is a horizontal agreement between A and B, there is no reason why others joining that conspiracy must be competitors"); *Spectators' Commc'n Network*, 253 F.3d at 223; *see also Klor's, Inc.*, 359 U.S. at 212–13; *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 294. Each court that has addressed the anticompetitive nature of these group boycotts was aware of the vertical components of the conspiracy and still applied per se liability to each member of the conspiracy. *See, e.g., Klor's, Inc.*, 359 U.S. at 208–09. For example, in *Klor's*, which remains controlling precedent, the Supreme Court applied per se liability to all of the participants in a group boycott that was arranged by only one competitor because there was a horizontal agreement among those that carried out the boycott. *Klor's*, 359 U.S. at 212–13.

We decline to hold that the Supreme Court silently overruled this line of cases by stating that vertical agreements to *regulate prices* that facilitate horizontal agreements to *regulate prices* "too, would need to be held unlawful under the rule of reason." *Leegin*, 551 U.S. at 893; *see also Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (recognizing, post-*Leegin*, that, under *Klor's*, per se liability applies to group boycotts with horizontal and vertical components). *But cf. Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) (holding that under *Leegin* per se liability did not apply to vertical agreements between manufacturers and distributors to refuse to deal with distributors that were not part of a horizontal price-fixing conspiracy, but not finding that the manufacturers joined a horizontal group boycott). The district court did not err when it instructed the jury that if they found that the manufacturers joined the conspiracy between the distributors, the manufacturers were per se liable for a § 1 violation.

18

No. 14-20267

## B.

JSW also argues that in the alternative scenario where this court does not outright apply the rule of reason to determine the legality of the alleged conspiracy, we should order a new trial because the jury was not instructed to consider the factors discussed in *Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 414–15 (5th Cir. 2007). The *Tunica* decision does not affect our above holding that the per se rule applies to the group boycott alleged in this case. Instead, *Tunica* potentially expanded per se liability. In *Tunica*, this court reversed summary judgment where the district court concluded that the per se rule applies only to group boycott cases "where one of the conspirators is a direct competitor of the victim." *Id.* at 414. This court recognized (post-*Leegin*) that per se liability applies to group boycotts where there is a horizontal agreement to foreclose a competitor from the market, but we also held that the per se rule is not limited to group boycotts where the horizontal agreement is among competitors. *Id.* at 413–14. The *Tunica* court then instructed the district court to consider three factors on remand to determine whether per se liability applies.[8] *Id.* at 414. Even if the *Tunica* court did not intend to expand per se liability, the application of the three factors was limited to the specific facts of that case. *See id.* at 414. The district court did not err by not applying these factors or instructing the jury to consider them before applying per se liability.

## III.

Finally, we address JSW's argument that the jury's damages findings were fatally defective because MM's damages expert, Stephen P. Magee,

---

[8] These factors were: "(1) whether the casinos hold a dominant position in the relevant market; (2) whether the casinos control access to an element necessary to enable TWA to compete; and (3) whether there exist plausible arguments concerning pro-competitive effects." *Id.* at 414–15. In light of our description of the alleged conspiracy, each of these factors would likely be met in this case.

19

No. 14-20267

should have been excluded. Before trial, JSW filed a *Daubert* motion to exclude Magee's testimony as unreliable. The district court denied the motion. JSW renewed the same objections at trial, in motions for judgment as a matter of law post-trial, and in a motion for a new trial, all of which the district court denied. JSW raises the same arguments on appeal.

We review "the district court's determination of admissibility of expert evidence under *Daubert* for abuse of discretion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (referencing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Under *Daubert*, "[t]he proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998). The *Daubert* inquiry is flexible, but the proponent must establish reliability by showing that the testimony is based on reasoning or methodology that is "scientifically valid." *Id.*

JSW contends that there are four problems with Magee's testimony and with the jury's damages award. In so arguing, JSW asserts that the existence of any of these problems individually, or all cumulatively, requires a new trial or remittitur. JSW contends that when using the yardstick model of damages, Magee (1) relied on an invalid comparator, (2) used the wrong time period for comparison, (3) "assumed a gross-profit margin that, indisputably, no company achieved during the alleged damage period," and (4) failed to take into account MM's settlement with Chapel that reduced its customer pool for the first six months of operation. We find no abuse of discretion in the district court's admission of Magee's testimony.

JSW's asserted fatal flaws all relate to the expert's use of the yardstick model. We have described this model as follows:

20

No. 14-20267

> There are two generally recognized methods of proving lost profits:
> (1) the before and after theory; and (2) the yardstick test. The
> before and after theory compares the plaintiff's profit record prior
> to the violation with that subsequent to it. The before and after
> theory is not easily adaptable to a plaintiff who is driven out of
> business before he is able to compile an earnings record sufficient
> to allow estimation of lost profits. Therefore, the yardstick test is
> sometimes employed. It consists of a study of the profits of
> business operations that are closely comparable to the plaintiff's.
> Although allowances can be made for differences between the
> firms, the business used as a standard must be as nearly identical
> to the plaintiff's as possible.

*Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974). Because MM was newly formed at the time the alleged conspiracy began, it had no financial performance to use as the "before" in the before and after test. Thus, Magee used the yardstick approach. As a comparator, Magee chose the first twelve years of operation at Chapel's Houston office, which Schultz and Hume had opened and ran until they left to start MM. He excluded an outlier year in which Chapel's performance was extraordinary. Magee imported the average gross-profit margin from this comparator and projected profits, assuming that MM would have kept operating for ten years. We find no abuse of discretion in allowing Magee to testify according to this approach.

JSW asserts that Chapel's Houston office was too different from MM to be a reliable comparator in the yardstick model. An antitrust plaintiff must "demonstrate the reasonable similarity of the business whose earning experience he would borrow." *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 208 (5th Cir. 2000). MM has adequately done so here. Chapel's Houston office is not nearly as dissimilar as other comparators this court has found to be improper yardsticks. *See El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 (5th Cir. 2005) (where an expert "made no effort to demonstrate the reasonable similarity of the plaintiffs' firms and the businesses whose earnings data he relied on as a benchmark"); *Eleven Line,*

21

No. 14-20267

*Inc.*, 213 F.3d at 208 (where the expert's yardstick was not nearly identical and he offered no evidence of the comparators' geographic location, size, market served, or costs of operation). Magee's yardstick was "as nearly identical to [MM] as possible." *Lehrman*, 500 F.2d at 667; *cf. J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) (noting that courts are willing to accept some uncertainty in antitrust damages estimates because the "vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation"). Therefore, the district court did not abuse its discretion by concluding that Magee's comparator was reliable.

Similarly, JSW contends that Magee should have used the years 2011–2013 as his benchmark period instead of 2001–2011. JSW contends that 2001–2011 were "some of the best years for the steel industry" and are not representative of the industry's future performance. As support, JSW cites weaknesses in the steel market in 2011–2013. JSW has not shown that Magee's use of 2001–2011 data was unreasonable or unsupported. Magee excluded one extraordinary year (2004), and his benchmark period included six years of recession. The defendants had the opportunity to show whether the benchmark period was correct on cross examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). We find no abuse of discretion as to this point.

JSW also asserts that Magee's model is unreliable because no actual competitor achieved the gross-profit margin that his model projected for MM. This criticism is related to the previous two criticisms; Magee used the gross-profit margin achieved by Chapel's Houston office between 2001 and 2011 (excluding 2004). JSW contends that Chapel's Houston office from 2012–2013,

22

No. 14-20267

or MM acting as a broker in 2011, is the proper comparator for gross-profit margin. Magee's assumption that MM would achieve better margins than its competitors was reasonable based on evidence that MM's leadership was simply better than that of its competitors. While at Chapel, MM's founders had achieved a twenty percent profit margin in a year so bad for the steel industry that another distributor had its first negative year in forty years. Magee's projections were perhaps rosy, but they were not unreliable. In addition, JSW's competing expert adequately aired his disagreement. It was not an abuse of discretion to allow MM's expert to provide his own model reaching a different projected gross-profit margin. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) ("The fact-finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate.").

Lastly, JSW argues that Magee failed to consider the fact that for the first six months of operation, MM was prohibited from doing business with approximately 190 of Chapel's former customers. Magee's testimony shows that he considered this limitation but ultimately decided the limitation was temporary and would not affect MM's sales potential. This decision did not make Magee's testimony unreliable.

Because the district court did not abuse its discretion by admitting the testimony of MM's damages expert, Magee, the district court correctly denied JSW's motion for a new trial. *See Munn v. Algee*, 924 F.2d 568, 575 (5th Cir. 1991) ("When reviewing the disposition of a new trial motion, we normally reverse the judgment only for an abuse of discretion.").

## CONCLUSION

Following a six-week jury trial, the district court entered judgment for MM on its claim under § 1 of the Sherman Act alleging an illegal conspiracy

23

No. 14-20267

between the distributors and manufacturers of the Gulf Coast domestic steel industry.  MM alleged that Nucor and JSW, steel manufacturers, joined the horizontal conspiracy between MM's competing distributors to refuse to deal with MM.  The jury was correctly instructed to apply per se liability if they found that the manufacturers joined the conspiracy.  The jury, finding that the manufacturers joined the conspiracy, awarded MM damages of $52 million, which the court trebled.  We hold, among other things, that there was substantial evidence for the jury to conclude that JSW joined the conspiracy between the distributors.  However, there was not substantial evidence, direct or circumstantial, to conclude that Nucor joined the horizontal conspiracy between the distributors—MM's only theory of § 1 liability.

We REVERSE the judgment as to Nucor and AFFIRM the judgment as to JSW.